THE STATE OF KANSAS, *on the relation of L. B. Kellogg, Attorney General*, v. JOSEPH M. SANDERS, *et al.*

WALLACE COUNTY — *Organization — County Seat — Valid Act.* The act entitled "An act to enable the county commissioners of Wallace county to settle and prevent controversies arising out of the organization thereof, by retaining the town designated by the governor as the temporary county seat of said county for five years; and by paying certain claims which accrued before its valid organization," approved February 27, 1889, is constitutional and valid.

*Original Proceeding in Mandamus.*

THE opinion, filed at the October, 1889, session of the court, contains a sufficient statement of the case.

*Johnson, Martin & Keeler*, for plaintiff.

*J. M. Sanders*, county attorney, and *David Rathbone*, for defendants.

The opinion of the court was delivered by

JOHNSTON, J. : This is an original proceeding in *mandamus*, brought to compel the county officers of Wallace county to hold their offices at Sharon Springs, which is alleged to be the county seat of Wallace county. The cause was submitted upon the pleadings and admissions of the parties, and the material facts upon which the controversy depends are substantially as follows : Wallace county was organized by the governor on January 5, 1889, and a majority of 94 of the legal voters of the county having expressed a choice for Sharon Springs, that place was designated by the governor as the temporary county seat. Following upon the organization, the legislature passed an act entitled, "An act to enable the county commissioners of Wallace county to settle and prevent controversies arising out of the organization thereof, by retaining the town designated by the governor as the temporary county seat of said county for five years; and by paying certain claims which accrued before its valid organization." This

act was approved on February 27, 1889, and went into operation on March 2, 1889. (Laws of 1889, ch. 114.) Section 1 of this act provides for the settlement of claims which accrued after the first organization of the county, in 1868, and prior to the present organization, effected in 1889. Sections 2 and 3 of the act authorize the retention of the county seat at the place designated by the governor for a period of five years, and prescribe the method of accomplishing it, and are as follows:

"Sec. 2. The board of county commissioners of Wallace county, in the state of Kansas, are hereby authorized to retain the town designated by the governor as the temporary county seat of Wallace county as the county seat of said county for five years from the passage of this act.

"Sec. 3. If the said board shall within thirty days from the taking effect of this act find and enter on the journal of its proceedings that it is for the public interest to retain the town designated by the governor as the temporary county seat of Wallace county as the county seat of said county for five years, then no election for the location or relocation of the county seat of said county shall be called or held during the five years mentioned in section one."

In pursuance of this act, and at a meeting regularly called for that purpose, the board of county commissioners of Wallace county, on March 7, 1889, found and determined that it was for the public interest to retain the town of Sharon Springs as the temporary county seat of Wallace county for five years, and that no election should be called for the location or relocation of the county seat during that period. The finding and order were duly entered in the journal of the proceedings of the board. The county commissioners then divided the county into townships, and called and gave notice of a special election to be held on April 15, 1889, for the election of county officers, but no mention was made of a county-seat election, nor was any notice given that the question of permanent county seat would be voted upon at that election. When the election was held, votes were cast for the town of Wallace for county seat; but the friends of Sharon Springs, relying upon the legis-

lative act, assumed that no election for the location of the
county seat could be held within five years after the passage of
the act, and therefore did not vote upon the question.    After
this first election a canvass was made of the votes cast for county
officers, but no notice was taken of those cast for county seat.
A new board of county commissioners was chosen at the elec-
tion, and this board, being favorable to Wallace, convened
and recanvassed the result of the election, and it found and
declared that the town of Wallace had been chosen as the per-
manent county seat of the county by a majority of 54 votes.
The county officers chosen at the first election, being favorable
to Wallace, on April 25, 1889, removed the records and files
of their respective offices from Sharon Springs to Wallace,
where they still remain.    The attorney general brings this
proceeding to compel their return.

There is involved in the proceeding the validity of the act
of February 27, 1889, and if that should not be sustained,
then there would arise the question of whether the votes cast
for county seat at the special election held on April 15, 1889,
are valid and can be counted in favor of the town of Wal-
lace, no notice of such election having been given.    It will
be unnecessary to go further than an examination of the ques-
tion as to the validity of the statute mentioned.    The conten-
tion is that the act is in violation of §16 of article 2 of the
constitution, in which it is provided that "no bill shall con-
tain more than one subject, which shall be clearly expressed
in its title."    It is claimed by the defendants that the author-
ity to settle the claims which had accrued against the county
of Wallace prior to the present organization constitutes one
subject, and the provision authorizing the retention of the
county seat at the place designated by the governor for five
years is another subject, having no connection or relation with
the first.    There can be no complaint that the title to the act
does not fairly indicate its subject-matter.    It is comprehen-
sive, and clearly covers the provisions and purpose of the act,
which were a settlement of the controversy concerning the or-
ganization of the county.    The status of that county had

been a subject of dispute for more than twenty years. An organization was first effected in 1868, which was maintained for a time, and was vacated and set aside by the legislature in 1879. The effect of the act vacating the organization was not fully understood, some contending that the organization was not thereby annulled. In time the population of the county became so far reduced that all effort to maintain a county government was abandoned; but in 1886, a large number of people having settled in the county, some of them undertook to resuscitate the old organization and to set up a county government at the town of Wallace. This organization was continued for a period of nearly two years, during which time property was purchased for the county, debts contracted, and taxes were levied and collected. A full complement of county officers was chosen by the electors of the county, who severally performed the duties that are incumbent upon such officers in an organized county, and their organization was recognized as valid by some of the state officers. In 1888 a proceeding was begun in this court in which it was finally determined that that organization was invalid, and that Wallace was an unorganized county. ( *The State, ex rel., v. Hamilton,* 40 Kas. 323.) Following this determination, the present temporary organization was effected, and Sharon Springs was chosen for county seat, as has been already stated. In addition to the debts contracted by the Wallace government in 1888 and 1889, a judgment had been rendered against the county in 1876, which had never been satisfied. When the present organization was effected these obligations stood unpaid, and within 120 days from that time another election upon the question of permanently locating the county seat would, under the general law, have been held. It seems that a sentiment existed among some of the people in favor of compromising and ending the controversy over the organization and the location of the county seat, by permitting Sharon Springs to retain the county seat for a period of five years without further contests, in case the indebtedness incurred by the Wallace government, and that which had ac-

crued before the present organization, should be paid. The outgrowth of this was the passage of the act, the validity of which is now challenged.

Viewed in the light of the facts, we think that neither the title nor the act itself embraces more than a single subject within the meaning of the constitution. The constitutional provision "must not be construed or enforced in any narrow or technical spirit, but must be construed liberally on the one side so as to guard against the abuse intended to be prevented by it, and liberally on the other side so as not to embarrass or obstruct needed legislation." (*The State v. Barrett,* 27 Kas. 217.) As determined in that case, the title to an act may be as broad as the legislature may desire to make it, and it and the act may include innumerable minor subjects, provided all of these minor subjects are capable of being so united as to form one grand and comprehensive subject. The provisions of this act cannot be said to be incongruous or foreign to each other. They have a natural connection and relate to one general subject—the organization of the county or the settlement of a controversy concerning its organization. The act entitled "An act to establish a code of criminal procedure" is divided into 17 articles, each treating of separate matters. One of the articles treats solely of the custody and management of the estates of convicts, and provides for the appointment by the probate court of a trustee of the estate of a convict imprisoned in the penitentiary for a term less than life. The validity of this article was challenged in *Woodruff v. Baldwin,* 23 Kas. 491, and it was held not to be violative of § 16 of article 2 of the constitution. In *Comm'rs of Cherokee Co. v. The State,* 36 Kas. 337, the validity of chapter 75 of the Laws of 1886, "An act to authorize the board of county commissioners of Cherokee county to build a court house and to build and pay for bridges in said county, and to provide a fund therefor," was challenged upon the ground that the act contained more than one subject. Under the act a court house was authorized to be built, at a cost not exceeding $40,000, and also bridges in certain parts of the county—all of which were to be paid for out of a fund created by the levy

of taxes which the act authorized. It was held that these objects or provisions were not so diverse and foreign to each other as to render the act void. Following the rule of these and other cases, it must be held that the statute under consideration is not open to the objection which is made. (*Bowman v. Cockrell*, 6 Kas. 311; *The State v. Ewing*, 23 id. 708; *Philpin v. McCarty*, 24 id. 400; *Comm'rs of Marion Co. v. Comm'rs of Harvey Co.*, 26 id. 181; *The State, ex rel., v. Cross*, 38 id. 696; *Fox v. Cross*, 39 id. 350; *Blood v. Mercelliott*, 53 Pa. St. 391; *The State v. County Judge*, 2 Iowa, 280; *Insurance Co. v. The Mayor, &c.*, 8 N. Y. 241; *Smith v. Commonwealth*, 8 Bush, 108.)

The next objection is that the act is in conflict with §17 of article 2 of the constitution, it being claimed that there is a general law applicable, and that the special law affects the uniform operation of the general one. The interpretation which was placed upon this provision of the constitution at an early day, and which has been accepted and acted upon by both the legislature and the courts since that time, must be regarded as settled and binding upon the court, whatever the views of its present members might be. In *The State v. Hitchcock*, 1 Kas. 178, it was decided that "the legislature must determine whether its purpose can or cannot be expediently accomplished by a general law." In *Comm'rs of Norton Co. v. Shoemaker*, 27 Kas. 77, it was decided that "the legislature, under the constitution, has discretion to determine the necessity for such special laws, and such statute is analogous to those conferring authority by special acts upon counties, townships and school districts to issue bonds." In *City of Wichita v. Burleigh*, 36 Kas. 34, it was held that—

"The legislature may pass a special act where a general law cannot be made applicable, and this although the special act may to some extent affect the uniform operation throughout the state of other laws; and generally, it is a question for the legislature to determine whether a general law can be made applicable, or not." (See also *Beach v. Leahy*, 11 Kas. 23; *Harvey v. Comm'rs of Rush Co.*, 32 id. 159; *Knowles v. Board*

*of Education,* 33 id. 692; *Washburn v. Comm'rs of Shawnee Co.,* 37 id. 217.)

The people of Wallace county have not been deprived of an opportunity to locate the county seat. The temporary county seat of a newly-organized county is not located at the will or discretion of the governor. It is the will of the electors which controls, and the governor is required to designate and declare the place chosen by the greatest number of electors to be the county seat. (Laws of 1887, ch. 128, §1.) Sharon Springs was selected as the county seat of Wallace county with the consent of a majority of the electors of the county, and hence the retention of that place cannot in any view be regarded as an infringement of §1 of article 9 of the constitution.

We find that none of the objections urged against the act can be sustained; and, holding it to be valid, it follows that judgment must be given in favor of the plaintiff in accordance with the prayer of the petition.

All the Justices concurring.