THE PARKER-WASHINGTON COMPANY V. THE CITY OF KANSAS CITY et al.

No. 14,756.    (85 Pac. 781.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW — *Amendment or Repeal of a Statute by Implication.* Statutes which effect the amendment of existing laws by implication are not within the purview of the constitutional provision that "no law shall be revived or amended, unless the new act contain the entire act revived, or the section or sections amended, and the section or sections so amended shall be repealed." (Const. art. 2, § 16; Gen. Stat. 1901, § 134.)

2. —— *Classification of Cities—Laws Applicable to a Class.* It is competent for the legislature to classify cities according to population for various purposes, and laws applicable to all of the members of any class so created may be general laws and have a uniform operation throughout the state.

3. —— *Reasonable Classification.* The matter of the method of providing for the cost of street improvements is one with relation to which cities may reasonably be divided into classes upon the basis of population.

4. —— *One City in a Class—Law Not Special.* A law for the government of cities of a certain population is not rendered special in its operation by the fact that there is at the time only one city in the state of the size designated.

5. —— *Cities Having Over 50,000 Population—Payment for Street Improvements.* Chapter 112 of the Laws of 1905, providing that in cities of the first class having over 50,000 population payment for street improvements shall be made by the issue of tax bills chargeable against the property specially benefited instead of by the issue of negotiable bonds of the corporation, is not obnoxious to that provision of the constitution relating to the amendment of laws, or to that forbidding the conferring of corporate powers by special act, or to that requiring general laws to have a uniform operation throughout the state.

6. BONDS—*Contractors—Character of Surety—Legislative Control.* It is competent for the legislature to require that persons contracting with cities for the improvement of streets shall give bonds for the faithful carrying out of their contracts, executed by some surety company authorized to do business in the state.

Parker-Washington Co. v. Kansas City.

Original proceeding in mandamus.  Opinion filed May 12, 1906.  Writ denied.

*T. A. Pollock,* for plaintiff.

*E. S. McAnany, Ralph Nelson,* and *Nathan Cree,* for defendants.

The opinion of the court was delivered by

MASON, J.: The statute for the government of cities of the first class as it existed prior to 1905 authorized all such cities to issue bonds to cover the expense of improving streets.  In 1905 an act was passed providing among other things that in cities of the first class having a population of over 50,000 such expenses should be met by the issuance of special tax bills against the property chargeable with the cost of such improvements.  (Laws 1905, ch. 112.)  After this act took effect the Parker-Washington Company, under a contract with the city, constructed some pavement in Kansas City, Kan.  By the terms of the act payment for this work should be made by tax bills, but the company now brings this proceeding seeking by mandamus to compel the city to make payment by bonds, under the provisions of the old law, upon the theory that the act of 1905 is void because it violates these several provisions of the state constitution:  (1) That relating to the method of amending existing laws; (2) that forbidding the conferring of corporate powers by special act; and (3) that requiring laws of a general nature to have a uniform operation throughout the state.

The portion of section 16 of article 2 of the constitution invoked in support of the first proposition reads:  "No law shall be revived or amended, unless the new act contain the entire act revived, or the section or sections amended, and the section or sections so amended shall be repealed."  (Gen. Stat. 1901, § 134.)

It is argued that the act of 1905 amends various

specific sections of the statute relating to cities of the first class, the language of which is closely followed in the corresponding sections of the new act, only such alterations being made as are necessary to accomplish the object already indicated—a change in the method of paying for public improvements in cities having a population of over 50,000; that the new act contains no reference to the old one, does not accomplish its repeal, and is therefore within the letter and spirit of the prohibition quoted. It is needless at this time to go into a discussion of the purpose and effect of the provision of the constitution referred to. That it has no application to amendments by implication is well settled. (Cooley, Const. Lim., 6th ed., 182; 26 A. & E. Encycl. of L. 708.) The act of 1905 in a sense amends various sections of the earlier act, but it does so by implication; it does not cover their entire subject-matter, and hence does not supersede them, but merely restricts the field of their operation; it is a complete and in a sense an independent enactment, which requires no reference to any other statute to make its meaning clear. The objection made to it in this respect is therefore not well taken.

Section 1 of article 12 of the constitution provides that "the legislature shall pass no special act conferring corporate powers" (Gen. Stat. 1901, § 210), and section 17 of article 2 that "all laws of a general nature shall have a uniform operation throughout the state." (Gen. Stat. 1901, § 135.) Whether the act in question is to be regarded as special and whether its operation is uniform throughout the state depend upon whether population affords a fair basis for the classification of cities with reference to the matters to which it relates, and whether the result it accomplishes is in fact a real classification upon that basis, and not a designation of a single city to which alone it shall apply, under the guise of such classification.

"In order to determine whether or not a given law

is general, the purpose of the act and the objects on which it is intended to operate must be considered. If these objects are distinguished from others by characteristics evincing a peculiar relation to the legislative purpose, and showing the legislation to be reasonably appropriate to the former and inappropriate to the latter, the objects will be considered, as respects such legislation, to be a class by themselves, and legislation affecting such a class to be general. But if the characteristics used to distinguish the objects to which the legislation applies from others be not germane to the legislative purpose, or do not indicate some reasonable appropriateness in its application, or if objects with similar characteristics and like relation to the legislative purpose have been excluded from the operation of the law, then the classification is incomplete and faulty, and the legislation not general, but local and special." (26 A. & E. Encycl. of L. 683.)

That for many purposes the classification of cities according to population is a natural and proper one is clear, and we think has never been doubted. The statutes providing for municipal government in this state have always proceeded upon the theory that a system adapted to a small town might not be suitable for a larger one. The theory has not been attacked, and is not open to attack. This general principle reaches the present case. Merely for illustration it may be suggested that the legislature was warranted in believing that in a large city there would be no difficulty in procuring all needed street improvements by issuing to the contractors non-negotiable obligations running directly against the property specially benefited, while in a smaller city the same result could only be assured by pledging the credit of the whole municipality to the final payment of the cost by the use of negotiable bonds.

Granting the reasonableness of the principle of classification, its application rests with the legislature and is not subject to judicial review, although an extreme case could perhaps be imagined in which a court would be justified in holding that an ostensible classi-

fication upon the basis of population was only color-able, its real purpose and effect being to limit the application of an act to a single community or group of communities, not distinguishable from others by any differences having relation to the subject-matter involved. Counsel for plaintiff contends that the present instance is such a case. Judicial notice is of course taken that Kansas City is now the only city in Kansas having over 50,000 inhabitants. This is not determinative of the matter, however, for it is not only conceivable and probable but practically inevitable that other cities in the state will in time attain that size. As was said in *The State v. Downs*, 60 Kan. 788, 57 Pac. 962:.

"An act general in its provisions, but which can presently apply to only one city on account of there being but one of requisite population or other qualification, but which was designed to, and can in all substantial particulars, apply to other cities as they become possessed of the requisite population or other qualification, cannot be regarded as a special act." (Page 793.)

In the plaintiff's brief much stress is laid upon the case of *State, ex rel. Knisely et al., v. Jones et al.,* 66 Ohio St. 453, 64 N. E. 424, 90 Am. St. Rep. 592, where the court set aside an act purporting to provide a general scheme for the government of all cities in the state by dividing them into a number of classes and subclasses or grades. The ground of the decision is clearly shown by this language of the opinion:

"In view of the trivial differences in population, and of the nature of the powers conferred, it appears . . . that the present classification cannot be regarded as based upon differences in population, or upon any other real or supposed differences in local requirements. Its real basis is found in the differing views or interests of those who promote legislation for the different municipalities of the state." (Page 487.)

The full force of this statement can be appreciated only from a consideration of the precise situation by

which the supreme court of Ohio was confronted. The legislature had originally divided all municipal corporations, according to population, into cities of the first class, cities of the second class, incorporated villages, and incorporated villages for special purposes. Separate rules were made for the government of each kind of organization, but as each municipality attained a size entitling it to a place in the next higher class it was advanced thereto by virtue of the statute. Later, subdivisions were made of these primary classes by means of which single cities became in fact vested for the time being with peculiar powers, and were governed by what were in fact charters for local government differing from those of any other city in the state. The court upon the view that this legislation fell within the rule already stated "reluctantly" upheld its validity.

Gradually the tendency toward the localization of municipal law increased, until at the time of the decision under consideration cities of the first class were divided into three grades, and cities of the second class into eight grades, and as a result each one of the eleven principal cities of the state was governed according to a plan different from that of any other. Moreover, during the time that Cincinnati was the most populous city of the commonwealth it was governed by a statute which in operation applied to it alone and was sustainable only on the theory that the legislature believed such a statute to be required by, or at least to be peculiarly suitable to, a city of that size. But when the growth of Cleveland placed it in advance of Cincinnati in the matter of population, instead of its becoming endowed with those powers which had been determined to be appropriate the old plan for its government was perpetuated by the device of shifting the classification. This situation certainly forced upon the court the duty of seriously considering the difficult question of when, if ever, the limit of legislative discretion is reached—

when, if ever, it may be judicially determined that a statute bears upon its face, or discloses in the light of all the information of which a court may avail itself, proof of the intention of the legislature, under color of the exercise of an undoubted right, to evade and in effect to nullify an express mandate of the constitution. But this was not all. Hitherto the pretext had been maintained that the classification was real—that as each city advanced in population and passed the boundary marked by the general law it would in virtue of that growth, either *ipso facto,* or by means of machinery provided by the law, pass into the next higher grade and become amenable to the statute relating thereto. But the statute which was directly involved in that case, with the obvious purpose of preventing such a result, at least in respect to two cities, created a new grade—a fourth grade of the first class, of which the court said:

"We are not aware that there is now in the state a city of the fourth grade of the first class, but the class is provided to the end that it may receive any city of the second class which may be advanced, and that such city may thus be excepted from the operation of these acts relating to Cleveland and Toledo, which are, respectively, cities of the second and third grade, of the first class." (66 Ohio St. 453, 486.)

The conclusion of the court is thus expressed:

"The body of legislation relating to this subject shows the legislative intent to substitute isolation for classification, so that all the municipalities of the state which are large enough to attract attention shall be denied the protection intended to be afforded by this section of the constitution. The provisions of the section could not be more clear or imperative, and relief from the present confusion of municipal acts and the burdens which they impose would not be afforded by its amendment. Since we cannot admit that legislative power is in its nature illimitable, we must conclude that this provision of the paramount law annuls the acts relating to Cleveland and Toledo." (Page 487.)

We see no just ground of criticism of this Ohio decision. We have stated the circumstances out of which it grew in some detail, for the purpose of showing the extreme length to which specialization of the law was permitted to be carried under the form of general enactments before the courts felt justified in interfering, and also of showing the wide difference between the facts of that case and of this. By the Kansas act under discussion the legislature in effect created a new class of cities. In doing so it did not approach near enough to the line which separates the legitimate exercise of legislative discretion from the illegitimate employment of a guileful device to accomplish an unconstitutional end by indirection to make it at all difficult for the court to sustain its action. The act is proof also against this attack.

A further objection is incidentally made to the statute because of a provision that all persons contracting with the city to make street improvements shall be required to secure the faithful performance of their contracts by the giving of bonds executed by some surety company authorized to do business in the state. It is argued that this tends to the creation of a monopoly in the business of making such bonds. The writing of such bonds is a form of insurance. There are reasons why a bond given by a corporation over which the state exercises a certain control might be deemed preferable to any executed only by individuals. It would be competent for the legislature to authorize the municipality in its discretion to exact such a bond—that is, one signed by a surety company; and it is equally competent for it to exercise its own judgment in the matter in the first instance and require that character of security.

The writ is denied.

All the Justices concurring.