H. S. CLARKE *et al.* v. THE CITY OF LAWRENCE *et al.*

No. 14,792   (88 Pac. 735.)

SYLLABUS BY THE COURT.

1. MUNICIPAL CORPORATIONS — *Public Improvements — Protest.* When a mayor and council of a city of the second class, having a population of more than 10,000 inhabitants, have adopted a resolution declaring that it is necessary to pave and curb a certain street or part thereof in such city, and have published such resolution in the official daily paper for five consecutive days, such mayor and council have power to cause such improvement to be made, unless a majority of the resident owners of real property liable to taxation for such improvement shall, within twenty days after the last publication, file with the city clerk their protest in writing against such improvement. (Gen. Stat. 1901, § 1068.)

2. ——— *Resident Owners—Qualifications.* In determining the total number of such resident owners of real property, neither the age, sex or the physical or mental condition of any owner nor the extent or value of his ownership is to be considered. The sole tests are residence and ownership.

Clarke v. Lawrence.

3. —— *Mistake in Dating First Publication of Preliminary Resolution.* · In the publication of such resolution the unauthorized placing of a head-line which states that the first publication was on a date one day earlier than it actually occurred will not, in the absence of proof that any one interested was misled to his prejudice thereby, vitiate such publication.

4. CONSTITUTIONAL LAW—*Title of an Act.* Chapter 366 of the Laws of 1901 is not unconstitutional by reason of any defect in the title, nor because the bill contains more than one subject, nor because it is in derogation of section 17 of article 2 of the constitution of Kansas. (Gen. Stat. 1901, § 135.)

Error from Douglas district court; CHARLES A. SMART, judge. Opinion filed January 5, 1907. Affirmed.

STATEMENT.

ON May 2, 1904, the city council of Lawrence passed a resolution that it was necessary for the public good and convenience that Rhode Island street in such city be paved and curbed between two designated points, specifying the material to be used, also that walks from the lot-lines to the curb-lines at the corners of streets be properly constructed, and all parkings be properly graded. It further ordered that this resolution be published in the official city paper for five consecutive days. The resolution was published in the official city paper on May 3, 1904, but a typographical mistake occurred in such publication by which the order for publication for five days was changed to ten days. On May 4, 1904, the error was corrected and the publication of the resolution as corrected was made on that day and on four successive days thereafter. Each of the publications had a head-line which read: "First published in the Lawrence Daily *World* May 3, 1904."

On May 27, 1904, a remonstrance was filed with the city clerk which was, on June 6, 1904, considered by the mayor and council, and was held insufficient as not having the requisite number of legal signers.

On June 8, 1904, an ordinance was passed providing

for the grading and paving of the portion of Rhode Island street described in the petition. Specifications and estimates were made by the city engineer thereafter, and the work was done according to contract, and was accepted by the engineer in December, 1904.

On October 7, 1904, the plaintiffs in error commenced this suit to enjoin the defendants in error from certifying the assessment and from levying or collecting any tax for the payment of such improvements. The case was tried in the district court, the injunction was refused, and the case is brought here for review.

*Barker & Means,* and *Fred A. Clarke,* for plaintiffs in error.

*George L. Davis,* city attorney, *C. E. Lindley,* and *John Q. A. Norton,* for defendants in error.

The opinion of the court was delivered by

SMITH, J.: Sections 1016 and 1068 of the General Statutes of 1901 are practically identical as to the preliminary steps necessary to give the mayor and council of cities of the second class jurisdiction to contract for and cause a street thereof to be curbed and paved, except the former section requires that the resolution passed for that purpose be published in the official paper of the city for four consecutive weeks if it be a weekly paper, and for ten consecutive days if such paper be a daily, while the latter section requires only that the resolution be published for two consecutive weeks if the official paper be a weekly, and five consecutive days if it be a daily. It is not contended that section 1016 has been expressly or by implication repealed, although section 1068 is the later enactment. Both provisions therefore seem to be in full effect. If, as the court found, the recital in the resolution requiring publication to be made for ten days was a clerical mistake, and after one publication the mistake was corrected to five days and the publication was made for five consecutive days thereafter, legal notice was in

Clarke v. Lawrence.

fact given. No question is raised that the finding was not supported by evidence. The heading, "First published in the Lawrence Daily *World* May 3, 1904," was misleading but was no part of the resolution, and was not required by law. The placing of it at the head of the publication seems to have been the unauthorized act of the publisher. The last publication was on May 8, and the protest was filed with the city clerk on May 27, nineteen days thereafter. The protesters do not seem to have been misled to their prejudice, as they had still one day in which to file their remonstrance, counting from the last publication as made. We conclude that the publication was legal and sufficient as a step in acquiring jurisdiction to proceed with the improvement.

Again, it is urged that the resolution of the city council and the published notice authorized only the paving and curbing of the street, while the contract for the work and the assessment of the cost to the lot owners included also the grading of the street. It is true that ordinance No. 148, which determined and assessed to the lot owners the portion of the expense of the improvements to be paid by them, did include grading. It is also true that ordinance No. 149, which determined what share of the expense the city should pay, also included grading. It devolved upon the plaintiffs in error to prove, before they were entitled to an injunction on this ground, that an illegal charge and assessment was about to be made against their property. That some grading is necessary to level or fill the inequalities in the surface of a dirt road to prepare it for receiving the pavement seems evident; also, that such leveling would be a necessary incident to the paving of a street, even after it had been brought to grade. It seems also to be conceded that the expense of bringing the street to grade devolved upon the city, and that the grading incident to the laying of the pavement devolved upon the property owners. If so, we think the court was justified in presuming and finding, in the

absence of evidence to the contrary, that the cost of grading had been properly apportioned by the mayor and council.

Another objection going to the jurisdiction of the mayor and council to contract for and improve the street in accordance with the resolution is that, as asserted, a majority of the resident lot owners of real property liable to taxation for the improvement did within twenty days after the last publication of the resolution file with the city clerk their protest in writing against such improvement. A protest was in fact filed within the time prescribed by the statute. Whether such protest was in fact signed by a majority of the owners of real property liable to taxation for the improvement determines the power of the mayor and council to proceed therewith. If a majority of such real-property owners did not sign such protest the power to proceed existed; if a majority did sign the protest the power did not exist. The determination of this question of fact was in the first instance for the mayor and council; on the trial of the case it was for the court.

Section 1068 of the General Statutes of 1901 makes no restriction as to the sex, age or the mental or physical condition of the owners of the real property affected; but the written protest must be by a majority of all such owners. No provision is made by the statute for any method of determining the number of real-property owners, and the court on the hearing of this suit for injunction properly considered the ownership of each parcel of real property which would be liable for taxation for the improvement and who the owner or owners thereof were as in issue, and proceeded to determine the aggregate number of resident owners of real property and the number of qualified persons who signed the protest. There were forty signers to the protest as to whom the defendants made no objection, and there were thirty-one resident owners of real property who did not sign as to the counting of whom the

plaintiffs did not object. The court found five other protesters qualified to protest, and that there were seventeen resident owners who did not sign the protest, in addition to those agreed upon, making ninety-three real-estate owners, of whom forty-five protested and forty-eight should be counted as favorable. The plaintiffs complain that two others, Eunice Finley and Mrs. Techla Fischer, signed the protest and should have been adjudged qualified protesters, and that eleven of the additional names counted as favorable were not qualified to be so counted; that the proper count should have been forty-seven protesters to thirty-eight silent owners to be counted as favorable.

Of the two additional protesters claimed, Fannie Wise was shown to be feeble-minded and mentally unsound. She was, at the time her name was attached to the protest, in a sanitarium at St. Louis. Her son, who signed her name to the protest without her knowledge at the time or since, had attended to her business for several years. There was no proof of agency nor of guardianship, and the name was properly rejected. The court found that Eunice Finley signed the protest; that some one without her consent and against her wish had drawn a line through her name thereon before the protest was filed; that she jointly with another had a life lease on a lot, subject to certain conditions, one of which was the payment of taxes; that the mayor and council had no knowledge of how the name came to be obliterated when the protest was acted upon by them. On these findings of fact we think Eunice Finley should have been counted by the court as a protester, and not as favorable, thus leaving the count forty-seven favorable to forty-six protesters. She was an owner of real estate and had expressed her will in the manner provided by law.

We have examined all the evidence and findings relating to the remaining fifteen real-estate owners who were counted as favorable and to whom objections were made. We find no error therein. Section 1068 of the

General Statutes of 1901 provides that if a majority of the resident owners of real property liable to taxation for such improvement shall not within twenty days after the completed publication file with the city clerk their protest in writing against such improvement, then the mayor and council shall have the power to cause the same to be made. Under this statute the whole number of owners of real estate liable to taxation for the improvement must be determined, else it could not be said what number constitutes a majority thereof. It is urged that minors and insane owners should not be counted, for the reason that they are presumed to be incapable of making their protest in writing. Authorities are cited from other states which seem to support this contention. Our legislature, however, made no such provision; the statute is specific and clear that the written protest of all such owners must be filed. While it may be said that a person who by reason of insanity or infancy is totally incapable of any expression of his will should not by reason of his silence, which he is unable to break, be counted favorable to the imposition of taxes upon his property, on the other hand it may be said that the mayor and council are elected for the purpose of representing and do represent such persons, as well as all other residents of the city, and as the percentage of such incapables is usually small our lawmakers intended that when such an improvement commended itself to such city officers as necessary for the best interests of the city such judgment must prevail, unless overruled by a majority of all the resident owners of real estate liable to taxation therefor. The latter view we adopt.

Again, it is urged that where the husband and father died, leaving real estate to his widow and children, or where title to real estate is divided between a life-estate and estates in remainder, the entire estate should be counted as having one vote only. That might be a wise law, as it might be wise to provide that the wishes of the property owners should be determined by the

number of lots or front feet owned; as, for instance, the owner of two lots should count for as much as two owners who have only one lot each. Such, however, is not our statute. As we read the statute the resident owner of an undivided one-tenth interest in one lot counts for as much as the absolute owner of ten lots, and the joint owners of an estate in remainder each count one. It provides for a count of noses and not of feet. A part of section 7342 of the General Statutes of 1901 reads:

"The word 'land,' and the phrases 'real estate' and 'real property,' include lands, tenements and hereditaments, and all rights thereto and interest therein, equitable as well as legal." (Subdiv. 8.)

We do not deem it necessary, in view of the numerous decisions of this court upon the subject of the titles to bills passed by the legislature, to enter upon any extended discussion of the objections now made to the title and provisions of chapter 366 of the Laws of 1901, from which section 1068 of the General Statutes of 1901, hereinbefore referred to, was compiled. Suffice it to say that the necessity for the special act—whether to be determined by the legislature or by the courts— is to be determined as of the time of the trial of this case below, and without regard to the constitutional amendment on this subject adopted since the trial. We are called upon only to say whether the trial court did or did not commit reversible error.

The constitution makes no division of cities into classes. By statute provision has been made for organizing towns and villages of less than 2000 inhabitants into cities of the third class and for their government; that when a city of the third class attains a population of over 2000 and not to exceed 15,000 it shall be a city of the second class, and different provisions are made for its government and different powers conferred upon it; that when any city attains a population of 15,000 it shall become a city of the first

3—75 KAN.

class, and different provisions are made for its government and still greater powers are conferred upon it and its officers. This division into classes is purely arbitrary, but is conceded to be within the legislative power. Why, then, is a subdivision of a class more repugnant to the constitution? If the lawmaking power deems it necessary and expedient to make certain provisions for cities of the second class having between 10,000 and 15,000 in population, why should it be regarded as special legislation any more than a provision which applies to a city of 2100 inhabitants and does not apply to one of 1500 inhabitants? In *Parker-Washington Co. v. Kansas City,* 73 Kan. 722, 85 Pac. 781, this court answered the inquiry adversely to the contention of the plaintiffs in error.

The use of the words "internal improvements" in the title of the act may not be the most fortunate, but we think they are not misleading. "Internal improvements," applied to a city, a county, a state, and to the nation, respectively, may in each case have a different meaning.

No error appearing, the judgment is affirmed.