No. 38,574

REDEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, *Plaintiff*,
v. THE STATE CORPORATION COMMISSION, *Defendant*.

No. 38,575

THE STATE OF KANSAS on the relation of Harold R. Fatzer, the Attorney General, *Plaintiff*, v. THE STATE CORPORATION COMMISSION and REDEVELOPMENT AUTHORITY OF THE CITY OF KANSAS CITY, *Defendants*.

(236 P. 2d 782)

Opinion filed October 24, 1951.

T. F. *Railsback* and *J..E. Schroeder,* both of Kansas City, argued the cause, and *Thomas H. Finigan, Jerome S. Koehler* and *J. K. Cubbison,* all of Kansas City, were with them on the briefs for the Redevelopment Authority of the City of Kansas City.

*Jay Kyle,* of Topeka, argued the cause, and *Frederick A. Mann,* of Topeka, and *Douglas Gleason,* of Ottawa, were with him on the briefs for the State Corporation Commission.

*Walter G. Klamm,* of Kansas City, argued the cause, and *Harold R. Fatzer,* attorney general, and *C. H. Hobart,* assistant attorney general, were with him on the briefs for the State of Kansas.

The opinion of the court was delivered by

THIELE, J.: The questions considered and determined in this opinion arise from two actions originally commenced on the same day in this court, and which, because the same statutes are involved, were consolidated for presentation and argument.

Although more detailed reference to the pleadings will be made hereafter to the extent necessary, it suffices here to say that in No. 38,574, Redevelopment Authority of the City of Kansas City, hereafter referred to as the Authority, seeks a writ of mandamus against the State Corporation Commission, hereafter referred to as the Commission, to compel the Commission to make and promulgate certain rules dealing with the subjects of condemnation of lands and the power of the Authority to issue notes, and arising under the provisions of chapter 118 of the Laws of Kansas of 1943 (now appearing as G. S. 1949, ch. 17, art. 47) as amended by chapter 206 of the Laws of 1951. In No. 38,575 the State on the relation of the attorney general, brings an action in quo warranto against the Commission and the Authority, alleging unconstitutionality of the above act as amended and other infirmities in the two acts, and that because thereof, the Commission is wholly without power or authority to make any rules or regulations and that the Authority is without power to carry out the purposes of the above statutes.

It may be observed that if the State's contention that the statutes are unconstitutional is upheld the basis for the Authority's motion for the writ of mandamus disappears.

We shall consider first the contentions as presented by the action in quo warranto. The petition alleges the status of the Commission and of the Authority, and the legislative history of the "Urban Redevelopment Law" first enacted by chapter 118 of the Laws of 1943 which provided for the creation of redevelopment corporations

to carry out the general purpose of clearing and rehabilitating substandard, insanitary and blighted areas in cities of the first class of a certain population, and of the amendments to the above act by chapter 206 of the Laws of 1951 which created a redevelopment authority, and conferred power upon it to accomplish the same purposes and objectives as a redevelopment corporation. Making reference to the motion for a writ of mandamus it admits certain allegations therein, the effect of which is that no corporation as contemplated by the original act of 1943 had ever been organized and chartered. The State then alleges that the act of 1943 as amended by the act of 1951 is unconstitutional because it violates article II, section 17, of the state constitution, in that it is a special law where a general law could have been made applicable and that under the act as amended it is applicable only to cities of the first class having a population of more than 125,000 and less than 150,000, and extensive allegations are made as to the population of Kansas City. The State further alleges that the act as amended is repugnant to article XII, section 1, of the state constitution, because it is a special act conferring corporate powers, and that both the original act of 1943 and the amending act of 1951 violate the provisions of article II, section 16, of the state constitution that no bill shall contain more than one subject in that the original act provided for the creation of redevelopment corporations for purposes set forth in that act while the act of 1951 introduced a new subject into the act, namely a new agency, redevelopment authorities. Without going into any detail the State also contends that the act as amended is not a proper exercise of legislative power in that a redevelopment corporation or authority is authorized to condemn and take property for a use not public; that the act as amended authorizes a city to loan, give or contribute moneys raised by taxation to the Authority thus diverting taxes and tax moneys from the purpose for which they were levied and in violation of article XI, section 5, of the state constitution. The State alleges that for the reasons asserted the Commission is wholly without power or authority to make any rules or regulations and the Authority is without power to carry out the purposes either of the act as originally drawn or as amended. Allegations as to the flood of 1951 and its effect in Kansas City and that the acts in question were not intended to apply to an area devastated by flood, and other allegations, need not be set forth here. We note that the State's prayer for relief is not limited to matters raised by it and the defendant

but is that we take jurisdiction and render "a judgment and decree in this action which will settle and forever put at rest each and every question raised by this action" etc.

For present purposes, it is noted that the answer of the Commission in effect admits the allegations as to status of the parties and the legislative history and denies generally. The answer of the Authority makes like admissions, denies generally, alleges certain provisions of the act as amended as to its power to condemn real property and as to its power to issue notes and bonds, denies that the State's contentions concerning the 1951 flood should enter into consideration, and its prayer is that while denying unconstitutionality or that the act as amended is arbitrary, unreasonable or capricious and not in the public interest, it does not oppose a searching inquiry and examination and joins with the State in its prayer that we take jurisdiction of the cause and consider not only the issues raised by the pleadings, but all matters apparent upon the face of the pleadings or upon the terms of the act as amended and determine and forever put at rest all questions of constitutionality and validity and render judgment according to the right.

As might be expected, the parties, in their briefs, suggest and discuss many questions concerning not only the constitutionality of the statutes under attack, and of the right of the Authority to have rules made by the Commission consistent with the construction of the statutes as advanced by the Authority and pertaining to the right of the Authority to exercise the right of eminent domain and the right to issue notes or bonds, but many other matters which may or may not be the subject of future difference of opinion, but the factual basis for which is not yet evident. We shall discuss only those matters necessary for a disposition of the State's contention that the statutes are unconstitutional and that the Commission is without power and authority to make any rules or regulations and that the Authority is without power to perform under the statutes.

It is not necessary that we make a complete and exhaustive review of the statutes in question. Quotations from the statutes will not be of complete paragraphs or sentences, but only sufficient to the discussion hereafter made. An effort will be made, however, to review the statutes sufficiently that the questions presented will appear clearly. As heretofore stated, the original act was chapter 118 of the Laws of 1943, which now appears as G. S. 1949, ch. 17, art. 47. Its title reads in part as follows:

"An Act to ameliorate social and economic conditions and to promote the general welfare, health and morals of the people of the state; to provide for the creation of 'urban redevelopment corporations' for the purpose of clearing, re-planning, rehabilitating and reconstructing substandard, insanitary and blighted areas in cities of the first class now or hereafter having a population in excess of 110,000, and determining and declaring the necessity of authorizing urban redevelopment corporations as agencies of the state to undertake the clearance and reconstruction of such substandard, insanitary and blighted areas in said cities;"

the remainder of the title, broadly stated, being a table of contents of the powers granted by the act.

Section 2 of the act (G. S. 1949, 17-4702) reads:

"It is hereby declared that in cities of the state substandard and insanitary areas exist which have resulted from inadequate planning, excessive land cover-age, lack of proper light, air and open space, defective design and arrangement of buildings; which, by reason of age, obsolescence, inadequate or outmoded design, or physical deterioration, have become economic or social liabilities, or both;"

and, in general, that such conditions are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, crime and poverty. Other specifications for need are set forth, and it is declared that the conditions set forth require the creation of the agencies set forth; that the protection and promotion of the health, safety, morals, welfare and reasonable comfort of the citizens of the state are matters of public concern and the necessity in the public interest for the provisions of the act is declared as a matter of legis-lative determination. Section 3 of the act (G. S. 1949, 17-4703) is made up of many definitions of words used in the act and includes one that the term "city" shall mean any city of the first class now or hereafter having a population of 110,000 or over. Section 4 (G. S. 1949, 17-4704) relating to the development plan needs no present attention. Section 5 (G. S. 1949, 17-4705) provides that within ten years from the date on which the act shall take effect (June 28, 1943) a redevelopment corporation may be organized in manner there provided. Without analysis it may be said that other sections authorize such a corporation to carry out an approved redevelop-ment plan under the terms, conditions and restrictions set forth. Included in the powers granted are the right to acquire property by condemnation and also the right to issue notes and bonds, both of which are subject to the prior approval of the state corporation commission.

Attention to the above statute will disclose many details which are not mentioned above because not of present interest, but it is

observed that the act makes no provision for carrying out its declared purposes except through a redevelopment corporation organized, existing and performing under the terms of the act. The act also included a section dealing with liberal construction to effectuate its purposes, another section as to separability, and another as to when it should take effect. The entire act contained 24 sections.

In 1951 the legislature enacted chapter 206 of the Laws of 1951, which amended 13 sections of the act of 1943 and enacted 4 new sections. The title to chapter 206 reads:

"AN ACT relating to urban redevelopment corporations or authorities in cities having a population of more than 125,000 and less than 150,000, amending sections 17-4703, 17-4704, 17-4705, 17-4706, 17-4709, 17-4711, 17-4714, 17-4715, 17-4716, 17-4717, 17-4718, 17-4720 and 17-4721 of the General Statutes of 1949, and repealing said original sections."

The content of the amendments and new legislation need not be fully detailed. For present purposes we note that the definition in G. S. 1949, 17-4703, was amended to read that the term "city" shall mean any city of the first class now or hereafter having a population of not less than 125,000 nor more than 150,000, and that the term "redevelopment authority or authority" shall mean a public body, corporate and politic, created by or pursuant to section 4 of the act. Section 4 is new and provides that there is created in each city a public body corporate and politic known as the "redevelopment authority" of the city, but that it shall not transact any business or exercise any power, unless the city shall approve by an ordinance passed under conditions set forth in that section. Section 5 is new and sets forth in some detail that an authority shall have all the powers necessary or convenient to carry out and effectuate the purposes and provisions of the act including the following powers "in addition to others herein granted." Then follow eleven designated powers which we need not detail. Section 6 is new and deals with the power to sell, lease, exchange or otherwise transfer property to any redeveloper and provides for redevelopment contracts. The other new section is 17 and treats of the power of an authority to issue notes or bonds, and liability thereon. Nothing in its terms has anything to do with constitutionality of the legislation. Although there is controversy between the parties as to changes made in particular instances, the general purpose of the remaining amendments was to confer on an authority the rights and powers conferred by the original act on redevelopment corpora-

tions, or, as the case may be, to the same restrictions. Such changes as were made as to the powers of either or both need not be discussed on the question of constitutionality of the act as it has been amended. And lest it be thought to have been overlooked, we note the legislative declaration that the agencies, instrumentalities and corporations created under the statute, are agencies and instrumentalities of the state (G. S. 1949, 17-4702 and G. S. 1949, 17-4720 as amended by Laws 1951, ch. 206, § 15) and to many instances throughout the acts requiring approval or consent of the state corporation commission as a condition precedent to some act to be done or power to be exercised. Without discussion at length, we agree with the contention of the Authority that the legislation was not intended to be any so-called disaster act, although a disaster such as the 1951 flood might produce conditions where the legislation would be effective.

The first question to be determined is whether the act as amended violates article II, section 17, of our constitution, which reads:

"All laws of a general nature shall have a uniform operation throughout the state; and in all cases where a general law can be made applicable, no special law shall be enacted; and whether or not a law enacted is repugnant to this provision of the constitution shall be construed and determined by the courts of the state."

Prior to its amendment in 1906 the above section did not contain the last quoted clause and whether a general law could be made applicable was early held to be a question for the legislature to determine. (*State of Kansas, ex. rel. Johnson, v. Hitchcock*, 1 Kan. 178, and later decisions were in accord. See e. g. *The State, ex rel., v. Sanders*, 42 Kan. 228, 21 Pac. 1073; *Hughes v. Milligan*, 42 Kan. 396, 22 Pac. 313; and *Comm'rs of Barber Co. v. Smith*, 48 Kan. 331, 29 Pac. 565.) In *Anderson v. Cloud County*, 77 Kan. 721, 95 Pac. 583, one of the first cases coming before this court after the amendment of 1906 it was held that the section as amended took from the legislature the right to determine finally when a general law could be made applicable and devolved upon the courts the duty to determine it as a judicial question without regard to any legislative assertion on the subject. Limits of space preclude a full review of the decision treating of general and special laws. It is noted the statute there in question was much more restricted than that now under consideration. Among other things it was said:

"The inherent vice of special laws is that they create preferences and establish irregularities. As an inevitable consequence their enactment leads to im-

provident and ill-considered legislation. The members whose particular constituents are not affected by a proposed special law become indifferent to its passage. . . . Meanwhile, in place of a symmetrical body of statutory law on subjects of general and common interest to the whole people, we have a wilderness of special provisions whose operation extends no further than the boundaries of the particular school district or township or county to which they were made to apply." (l. c. 730.)

and further that

"The first clause of this section of the constitution involves the question of classification, which it is apparent does not enter into the present case. Here there will doubtless remain in the future an ample field upon which lawyers may contend and courts and judges differ. It may be said in passing, however, that it will be the duty of the courts, when that question arises, to apply the established tests to determine whether an attempted classification by the legislature is a proper one, based upon some apparently natural reason suggested by necessity and occasioned by a real difference in the situation and circumstances of the class to which it applies, or whether it is arbitrary or capricious and excludes from its provisions some persons, localities or things to which it would naturally apply except for its own limitations. It may be said, however, that it will not become the duty of the courts to invent reasons for upholding a law which is repugnant to either clause of this provision." (l. c. 734.)

Since the amendment to the constitutional section in 1906 many cases have arisen in which it was contended legislation violated the section, as the long list of annotations to the section as printed in the General Statutes of 1949 will disclose. Speaking generally, it may be said that no one of the many decisions is decisive of the question now before us, as each case was decided upon the wording of the statute involved and the facts appearing in the particular case. It has been held that for an act to have uniform operation throughout the state it need not affect every individual, class or community but that it is competent for the legislature to classify and adopt a law general in its nature to a class, but the classification must be a natural and not a fictitious one (*Rambo v. Larrabee*, 67 Kan. 634, 73 Pac. 915); that classification of counties based on population and assessed valuation are ordinarily sufficient to satisfy the constitutional requirement (*State, ex rel., v. Wyandotte County Comm'rs*, 140 Kan. 744, 39 P. 2d 286) and that while the legislature has power to enact general laws applicable only to a portion of the state, or a community, or a certain class, if they operate uniformly on all members of the class created, the classification must be a natural one resting on a genuine and substantial basis (*State, ex rel., v. Allen County Comm'rs*, 156 Kan. 248, 133 P. 2d 165).

In the late case of *State, ex rel., v. City of Topeka*, 168 Kan. 663,

215 P. 2d 644, this court considered a claim of unconstitutionality of a statute pertaining to school election expenses in cities of the first class having a population of more than 70,000 and less than 100,000, the statute being upheld. In that opinion may be found citation of many of our decisions where it has been held that legislation based solely on population does not constitute special legislation nor contravene article II, section 17, of our constitution. That opinion, however, is limited generally to a discussion of population as a proper means of classification and does not otherwise treat whether the classification made was arbitrary or capricious, for the reason it bore no real and substantial relation to the subject matter of the act. In other cases it has been held that while the legislature has power to pass laws which apply to and operate uniformly on members of a class, the classification made must be a natural and germane one, not arbitrary or fictitious, and based upon distinctions which have a reasonable and substantial relation to the subject matter involved. See *State, ex rel., v. Allen County Comm'rs, supra; State, ex rel., v. Schoeppel,* 160 Kan. 396, 162 P. 2d 80; *Johnson County Comm'rs v. Robb,* 161 Kan. 683, 171 P. 2d 784; *State, ex rel., v. Wyandotte County Comm'rs,* 161 Kan. 700, 171 P. 2d 777; *Carson v. Kansas City,* 162 Kan. 455, 177 P. 2d 212; and *Board of County Comm'rs v. Robb,* 166 Kan. 122, 199 P. 2d 530.

In considering whether a classification made by the legislature is arbitrary or capricious, the court determines the question not upon proof of facts or conditions, but upon the theory that judicial notice constitutes the proof. (See *State, ex rel., v. School District,* 140 Kan. 171, 34 P. 2d 102; *Barker v. Kansas City, infra.*)

In *Parker-Washington Co. v. Kansas City,* 73 Kan. 722, 85 Pac. 781, and decided prior to the constitutional amendment of 1906, the general question was constitutionality of an act where the classification was limited to cities of the first class having a population of over 50,000. In upholding constitutionality of the act the court said:

"Whether the act in question is to be regarded as special and whether its operation is uniform throughout the state depend upon whether population affords a fair basis for the classification of cities with reference to the matters to which it relates, and whether the result it accomplishes is in fact a real classification upon that basis, and not a designation of a single city to which alone it shall apply, under the guise of such classification.

.    .    .    .    .    .    .    .    .    .    .    .    .

"That for many purposes the classification of cities according to population is a natural and proper one is clear, and we think has never been doubted. . . .

"Granting the reasonableness of the principle of classification, its application rests with the legislature and is not subject to judicial review, although an extreme case could perhaps be imagined in which a court would be justified in holding that an ostensible classification upon the basis of population was only colorable, its real purpose and effect being to limit the application of an act to a single community or group of communities, not distinguishable from others by any differences having relation to the subject-matter involved." (l. c. 724.)

In *Panhandle Eastern Pipe Line Co. v. Miami County Comm'rs,* 151 Kan. 533, 99 P. 2d 828, which may be distinguished from the case under consideration in that the classification of the statute there attacked contained not only a population limitation but others, it was said that:

"A law to be regarded as general must embrace all and exclude none whose conditions and wants render such legislation equally necessary or appropriate to them as a class. A law may be special by being so restricted as not to include all the subjects of a class and also where it excludes subjects of a class from its operation (*Board of Education v. Davis,* 87 Kan. 286, 123 Pac. 885)." (l. c. 537.)

In *State, ex rel., v. Allen County Comm'rs,* supra, the court considered constitutionality of a statute pertaining to reimbursements of certain benefit district road payments, the title and act being set forth in the opinion. In the course of the opinion it was said:

"It is true the legislature has power to enact laws of a general nature which will be applicable only to a certain portion of the state, to a community or to a certain class of citizens. In other words, the legislature has power to pass laws which apply to and operate uniformly on all members of the class created, but the classification created must be a natural one and must rest upon a genuine and substantial basis. The classification cannot be an arbitrary or fictitious one but must be based upon real and substantial distinctions which have a reasonable and substantial relation to the subject matter involved. These principles frequently have been applied to legislation embracing various and sundry subjects. (Citations omitted.)" (l. c. 252.)

"Wherein does a natural, real and genuine distinction or basis lie for a classification which discriminates between relief afforded landowners in road benefit districts who reside in counties where the county unit system obtains and similar landowners who reside in counties where that system does not obtain? If such a natural and genuine distinction or basis for classification inheres in the county unit system we are not familiar with it and no such basis is disclosed in the briefs presented." (l. c. 254.)

The conclusion of the court is reflected in the syllabus, the first paragraph of which recites:

"The legislature has power to pass laws which apply to and operate uniformly on all members of a class, but the classification created must be natural

and genuine. The classification cannot be an arbitrary or fictitious one but must be based upon distinctions which have a reasonable and substantial relation to the subject matter involved."

In *Carson v. Kansas City,* supra, the court considered constitutionality of a statute pertaining to street improvements. As originally enacted in 1927 the statute applied to any city of the first class then or thereafter having a population of over 110,000, and a contention that statute was unconstitutional was denied in *State, ex rel., v. Kansas City,* 125 Kan. 88, 262 Pac. 1032. Thereafter the statute was amended in 1931 to raise the population figure to 120,000 and in 1941 it was further amended so as not to apply to any city in a county having a fixed tax valuation. The question was raised that the amended statute was unconstitutional. This court noted it had been advised the statute was amended to prevent its being applicable to Wichita. Remarking that under the statute if the population increased to more than 120,000 the statute became applicable provided the assessed value was not over the fixed amount, the court said:

"No reasonable basis has been suggested for such a classification and we discern none. The obvious purpose of the amendment was to make the statute apply only to Kansas City, and the result is that if the tangible property valuation of Wyandotte County should increase to more than $150,000,000 the statute would then cease to apply even to that city." (l. c. 458.)

The court cited and quoted from *State, er rel., v. Wyandotte County Comm'rs,* 161 Kan. 700, 171 P. 2d 777, and *State, ex rel., v. Schoeppel,* supra, and followed the reasoning therein, and held the amended statute contravened the constitutional mandate.

Other cases upholding the proposition that while the legislature has power to pass laws which apply to and operate uniformly on all members of the class, the classification must be natural and genuine, not arbitrary or fictitious, and must be based upon distinctions which have a reasonable and substantial relation to the subject matter involved, are *Berentz v. Comm'rs of Coffeyville,* 159 Kan. 58, 152 P. 2d 53; *State, ex rel., v. Schoeppel,* supra; *State, ex rel., v. Wyandotte County Comm'rs,* 161 Kan. 700, 171 P. 2d 777; *City of Kansas City v. Robb,* 164 Kan. 577, 190 P. 2d 398.

Many of the above decisions later handed down refer to *Barker v. Kansas City,* 149 Kan. 696, 88 P. 2d 1071. In that case this court considered a statute, the title of which stated it was an act authorizing cities of the first class having a population of over 120,000 to establish benefit districts for parking stations for public use, and

later amended to authorize such cities to acquire and improve parking stations for public use. At the time of its enactment, the act affected only the city of Kansas City. This court held that applied only to its title the act was not in contravention of the constitutional provision but by reason of limiting provisions in the body of the act as to time in which to act that there was no probability it would affect any other city. After reviewing some of our decisions, it was said:

"In the briefs and in the arguments the assigned reason for the parking stations is to afford a measure of relief from traffic congestion on the streets. Assuming that to be the purpose of the act, and no other occurs to us or is indicated in the act or its amendment, we discern no difference between the traffic situation as it exists in Kansas City as distinguished from Wichita, or of those two cities as distinguished from many other cities of Kansas. Laying aside, for the moment, the constitutional provision that corporate power may not be conferred by special act, no reason has been made to appear why the evil sought to be remedied or the good sought to be accomplished may not be by an act of general nature." (l. c. 704.)

The conclusion of the court was that the act and the amendatory act contravened constitutional provisions.

There are many other decisions of this court which might be mentioned, but those set forth are deemed sufficient to show the conclusions reached in all, and adequate for consideration and determination of the questions involved.

In a preliminary way, we note that under those decisions we are to take judicial notice of matters, which include, in the cases before us, the population of "cities of the first class now or hereafter having a population in excess of 110,000," "any city of the first class now or hereafter having a population of 110,000 or over" as used in the title or body of Laws 1943, ch. 118, and "cities having a population of more than 125,000 and less than 150,000" and "any city of the first class now or hereafter having a population of not less than 125,000 nor more than 150,000" as used in the title or body of Laws 1951, ch. 206. The census taken under the authority of G. S. 1935, ch. 11, and G. S. 1949, ch. 11, shows that the populations in 1942 and 1950, being the figures before the legislature when the respective acts were passed, of the three largest cities in the state, were

| City | 1942 | 1950 |
|------|------|------|
| Wichita | 133,144 | 192,155 |
| Kansas City | 124,267 | 128,821 |
| Topeka | 68,938 | 87,626 |

and that there was no other city in the state, at either date, having a population in excess of 35,000.

We examine the two statutes involved in the light of the rules of construction heretofore set forth.

Ignoring for the moment the subject matter of the acts and any limitations contained in the body of the acts, and restricting examination solely to the titles of the acts, both of which are sufficiently set out earlier herein, we think that under the decisions it may not be said that the classification made in Laws 1943, ch. 118, was arbitrary or capricious. It is noted however that that act provided only for the creation of redevelopment corporations, made no reference to redevelopment authorities and so limited is of no importance to the defendant Authority. Subject to the premise set out in the beginning of this paragraph, it is noted that the title to Laws 1951, ch. 206, while fixing population limits, can hardly be said to be arbitrary or capricious for that reason alone.

At the time the 1943 act was passed it presently had operation only in Wichita and Kansas City. Before Topeka could come within its terms, that city had to gain over 41,000 in population. In view of the fact the act contained a limitation that a redevelopment corporation had to be organized within ten years from the effective' date of the act (G. S. 1949, 17-4705) there was little probability it would ever affect Topeka. We need not discuss whether the act was bad under the reasoning of *Barker v. Kansas City*, supra, in view of the amendment of the section in 1951.

We turn to the subject matter of the statutes. The purpose of the legislation is stated in section 2 of the original act (G. S. 1949, 17-4702) and was not affected by the amendments of 1951. In that section the legislature declared that in cities of the state (not just those having a population in excess of 110,000) substandard and insanitary areas result from inadequate planning, excessive land coverage, lack of proper light, air and open space, and many other reasons set forth in that section, and that it was necessary to create agencies, instrumentalities and corporations for the purpose of attaining the ends recited in the section. Other sections of the act provide for the organization of redevelopment corporations, which, broadly stated, were authorized to acquire the property in the designated area by gift, purchase or the exercise of the right of eminent domain and to improve the same by possible replanning, relocation of streets, establishment of parks, construction of improvements and lease or sale of that part not dedicated to

the public use. Although not fully complete, the above statement sufficiently discloses the subject matter of the legislation and the problem which the legislature sought to solve. Just what relation there may be between the conditions sought to be remedied and the population of the city in which the affected areas might exist does not appear. Although the act states that the prescribed con- ditions exist in cities of the state, by its population limit, as origi- nally drawn, it affected only Wichita and Kansas City. As has been remarked, the time limitation practically eliminated Topeka. It requires no extended discussion to demonstrate that the evils which the original act sought to eliminate were not existent only in Wichita and Kansas City but were common to many other cities of the state. But we need not stop there. In 1951 the act was amended to provide for redevelopment authorities. It was further amended so that it was presently effective only in cities of from 125,000 to 150,000 population. Just what did those limitations have to do with the subject matter? The limitation fixed made the act applicable only in Kansas City. It may not be said that Topeka in the course of time will grow in population so as to come under the act of 1943 was amended by the act of 1951 and at the same time that Wichita may decrease in population so that it may be under it. Any classification based on population must be justi- fied in view of the subject matter of the legislation, and if the classification made is for the purpose of restricting operation of the legislation where the evil sought to be remedied affects many others, it ought not to be held reasonable, but arbitrary and ca- pricious. Stated another way, if the classification on a population basis is only colorable and bears no relation to the subject matter, but is designed to include some and exclude others, all of whom would otherwise be affected by the legislation, the attempted classi- fication ought not to be sustained for the effect is that the act is not uniform in operation but is special legislation. No one at all familiar with legislative processes can read the original act and the amendment without reaching a conclusion that the purpose of population limitations in the 1951 act, by which redevelopment authorities were created, was to prevent possible opposition from cities which might otherwise be affected, and to procure legisla- tion which there was little probability would ever effect any city except Kansas City. We can discern no reasonable basis for the classification made.

In our opinion the subject matter of the 1943 statute, as amended by the 1951 statute, discloses a situation where a general law

could have been made applicable; that by reason of limitations made as to population the law was special and that the two laws contravene article II, section 17, of our constitution.

The briefs present for our consideration and determination cases from other jurisdictions concerning validity of similar legislation in those jurisdictions, as well as many claims of inconsistency in our statutes as to the extent of power of a redevelopment corporation, one of which is not before us, and of a redevelopment authority, and as to how far the powers or restrictions contained in the two statutes affect either or both of these statutory creatures. In view of our conclusion we need not discuss these contentions. Nor in view of our conclusions need we discuss matters arising in the action for a writ of mandamus. If perchance the legislature enacts another act of similar purpose, it may be so drawn as to eliminate any inconsistent grants of power or authority, or of restrictions thereon.

The judgment of the court is that the State Corporation Commission is without power or authority to make rules or regulations and that the Redevelopment Authority of Kansas City is without power to perform any acts, all as attempted to be conferred by Laws 1943, ch. 118, as amended by Laws 1951, ch. 206; that judgment for the State should be ordered in Case No. 38,575, and that the writ of mandamus sought in Case No. 38,574, should be denied, and it is so ordered.