No. 30,732.

H. J. PUTNAM et al., *Appellees,* v. THE CITY OF SALINA et al., *Appellants.*

No. 30,733.

L. C. HOUSEL et al., *Appellees,* v. THE CITY OF SALINA et al., *Appellants.*

(17 P. 2d 827.)

Opinion filed January 7, 1933.

*W. S. Norris,* of Salina, for the appellants.

*C. W. Burch, B. I. Litowich* and *LaRue Royce,* all of Salina, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: These actions, consolidated for purposes of trial, were brought by plaintiffs to enjoin the city of Salina and its officials from constructing a new channel for the Smoky Hill river at and near the eastern limits of the city. The project was designed to protect public and private property thereabout from recurring floods. The proposed channel was to be 3,500 feet in length, and would shorten the tortuous course of the stream to the extent of several miles. The improvement also contemplated the construction of a dam, certain dykes, and a $48,000 bridge, as incidents to the main project.

The city took the initial step toward the projected improvement by the adoption of a resolution, March 18, 1929, reciting that it was deemed necessary for the public good that the bridges, streets, alleys and other public and private property in the city be protected from the overflow of the Smoky Hill river, and the city engineer was directed to make a survey of the territory.

On October 24, 1929, the engineer's report was filed, and four days later it was approved by the city government, and likewise approved by the public service commission on November 25, 1929.

The city next procured the services of a firm of consulting engineers who made a survey of the volume of flood waters of the river and matters pertinent thereto.

On February 17, 1930, the city authorized a survey of a right of way for the proposed improvement, and on May 5, 1930, the right of way thus surveyed was subjected to condemnation; and, on application to the district court, commissioners were appointed to appraise the condemned property and to assess damages for the land taken.

At this stage of the proceedings, on June 28, 1930, this action, No. 30,732 herein, by Putnam *et al.*, was begun against the city and its governing officials to restrain them from constructing this projected improvement. Plaintiffs pleaded the foregoing facts and alleged that they were owners of described lands which would be subjected to condemnation for the proposed improvement; that dykes and ditches would be constructed thereon; that plaintiffs' property contained a highly valuable stratum of sand and gravel for which there was a commercial demand; that they had erected a sand plant thereon costing $50,000, and that such plant had been operated for the past two years at an annual profit of $20,000.

Plaintiffs alleged that the proposed dyke would destroy their business, deprive them of access to their shipping facilities, confiscate their sand and gravel plant, render forty acres of their land inaccessible and worthless, subject their other lands to flood hazard, and cause other irreparable damages to them set out in detail. .

Plaintiffs further alleged that the territory of the proposed project lay outside the limits of the city; that defendants had not sufficient funds to construct it; that they were without authority to raise funds to pay damages; and that the statutes under which defendants were proceeding were violative of certain cited provisions of the state and federal constitutions.

On January 13, 1931, No. 30,733 herein was begun by Housel *et al.* against the city and its officials as a taxpayers' suit under the code (R. S. 60-1121). The petition recited substantially the same fact as in the Putnam case, and alleged that plaintiffs owned real and personal property in the city subject to taxation; that defendants had set about the projected flood control at public expense with the intent and purpose of subjecting all property within the city to the payment of assessments for such improvement and to pay damages for the condemnation of property taken for flood control and its incidents; and that defendants proposed to pay for the projected improvements and the damages pertaining thereto by a bond issue to

the amount of a half million dollars without a bond election to sanction such issue.

Plaintiffs further alleged that the engineers' estimates of costs and damages were wholly inadequate; that they took no account of resulting damages to lands which will inevitably be flooded if the proposed flood-control project is a success in the locality it is designed to protect; that no funds are provided to satisfy such resultant damages; and it was further alleged that defendants had made no effort to assess any benefits to private property on account of such improvement; and that defendants intended to cast the entire cost upon the taxpayers of the entire city and to issue the bonds of the city in payment therefor.

. Plaintiffs' petition concluded with allegations of various infirmities in the statutes (to be noted below) under which defendants assumed to act, and prayed for the same injunctive relief sought by plaintiffs in case No. 30,732.

In the first of these cases defendants answered at length, admitted their intention to proceed with the projected improvement, set out in detail the various procedural steps they had already taken, maintained the validity of the statutes under which they were acting, and concluded with a prayer for judgment in their behalf.

In the companion case of Housel *et al.* the answer made appropriate admissions and denials leading to a similar joinder of issues.

Both causes were tried by the court without a jury. Evidence for plaintiffs and defendants was introduced; findings of fact and conclusions of law were made, and judgment in favor of plaintiffs was rendered in both cases.

Defendants' motions to set aside the conclusions of law, for judgment on the findings of fact and for a new trial were overruled. Hence these appeals.

1. Before noticing the matters urged by defendants we must consider a motion of plaintiffs to dismiss on the ground that defendants have failed to procure and file a transcript of the testimony, yet have made repeated references to the evidence in the course of their brief and argument.

As these cases were tried by competent counsel it seems sufficient to say that the want of a transcript does not necessarily require the dismissal of an appeal but merely restricts the scope of appellate review.

"Failure to provide a transcript of the evidence does not necessarily require the dismissal of an appeal; it merely excludes from the scope of the review those features of the lawsuit dependent thereon." (*Lasnier v. Martin,* 102 Kan. 551, syl. ¶ 1, 171 Pac. 645.)

"Where appellee objects to the sufficiency of a record whose accuracy is dependent on the recollection of appellant's counsel of what transpired at the trial, a record so limited will not permit an unrestricted appellate review." (*Wyckoff v. Brown,* 135 Kan. 467, syl. ¶ 1, 11 P. 2d 718, 720.)

See, also, *Richards v. Kansas Electric Power Co.,* 126 Kan. 521, 526, 268 Pac. 847, and citations.

2. Turning to the legal questions reviewable in this restricted appeal, it is contended that the trial court erred in its ruling that the first of the statutes under which this project was undertaken (Laws 1917, ch. 87, R. S. 12-635 to 12-646) as originally enacted was unconstitutional. This statute, entitled "An act relating to natural watercourses," consisted of thirteen sections. Its first section suggests its general purpose:

"SECTION 1. That the mayor and council or the mayor and commissioners of any city in the state of Kansas, in which there is, or through which there flows, a natural watercourse, the overflow from which, in the event of high water, is liable to cause injury to any bridge, street, alley, public or private property, may, in order to prevent said injury, construct the necessary levees and embankments, change and raise the grade of streets and alleys and the approaches to bridges and raise said bridges and make all other improvements necessary to protect the same: *Provided, however,* That none of the provisions of this act shall be held or construed to repeal or affect the powers of drainage districts now organized under the provisions of chapter 215 of the Session Laws of 1905."

The succeeding sections prescribe the successive steps under which such improvement shall be made. By section 11 (R. S. 12-645) it was provided:

"That said [governing body] . . . shall provide. for the payment of said bonds and the interest thereon as the same becomes due and payable, by the levy of a general tax on all the taxable property in said city."

A rather obvious infirmity in this statute was that it gave sanction to the construction of a project of flood control for the benefit of *private* as well as *public* property, the cost of which should be met by a bond issue to be paid by the levy of a general tax upon *all* the taxable property of the city. Of course public taxation is not permissible for the improvement of' private property. In the early case of *Leavenworth County v. Miller,* 7 Kan. 479, 518, where

questions relating to the validity of a county bond issue given in aid of the construction of a railroad were under consideration, it was said:

"(1) Taxation must be for a public and not merely a private purpose; (2) the taxes must be properly apportioned; (3) the district taxed must have a special interest in and be specially benefited by the thing for which the taxes are levied."

This principle of taxation underlay our decisions in *C. B. U. P. Rld. Co. v. Smith, Treasurer, et al.*, 23 Kan. 745, and *City of Geneseo v. Gas Co.*, 55 Kan. 358, 40 Pac. 655. The same rule was well applied in *Loan Association v. Topeka*, 87 U. S. 655, 22 L. Ed. 455. See, also, *Darby v. Otterman*, 122 Kan. 603, 252 Pac. 903; 2 Cooley's Constitutional Limitations, 8th ed. 986, 1026; 37 Cyc. 719, 720; 26 R. C. L. 41-44.

However, it is not clear that the entire act of 1917 was unconstitutional because of the invalidity of section 11. It would seem that the want of a valid and pertinent provision in the statute for the assessment of benefits and for apportioning the cost of the improvement between the public and private property benefited thereby merely rendered the statute inoperative rather than unconstitutional as a whole. Such a view is supported by respectable authority. In *State, ex rel., v. Cincinnati*, 52 Ohio St. 419, 27 L. R. A. 737, a statute of eleven sections which authorized cities of a certain class to annex contiguous municipalities under specified conditions contained a constitutional infirmity in its first section, as originally enacted. That section was redrafted and reënacted by the legislature of Ohio. In litigation which followed it was contended that the originally defective section rendered the entire statute unconstitutional, and that its infirmity could not be cured by amending the section which had rendered abortive the entire act. But the court held otherwise. The pertinent headnote reads:

"An amended section of a statute takes the place of the original section and must be construed with reference to the other sections, and they with reference to it; the whole statute, after the amendment, has the same effect as if reënacted with the amendment, and hence, an unconstitutional statute may be amended into a constitutional one, so far as its future operation is concerned, by removing its objectionable provisions or supplying others to conform it to the requirements of the constitution." (Syl. ¶ 1.)

It seems to us that this rule is necessarily correct. If a section of any of our familiar and important statutes, such as that of descents and distributions, the statute of wills, the crimes act, or a section of

one of our codes of procedure, should be held unconstitutional, surely it would not be held that such an infirmity would vitiate the whole statute and necessitate its entire reënactment merely to amend and correct the objectionable matter in a single section. In 25 R. C. L. 906, this question is treated thus:

". . . Where the obnoxious features of the statute may be removed, or essential ones supplied by a proper amendment, so that it can be held that, had the law been primarily so framed under its title and within its scope as it has been by the amendment thereto, it would have been valid, it may be rendered valid by amendment, so far as its future operations may extend. . . . And, in the absence of such a constitutional provision, there can be little question but that a statute which violates a constitutional provision may be amended so as to remove the offending parts without reënacting the entire statute, if the defective provision is so separable from the rest of the statute as not to render it unconstitutional in its entirety, . . . This is on the theory, according to some decisions, that such an act is not void, but merely inoperative, and that it becomes operative on the removal of the defect by an amendment."

See, also, note on the legislative power to cure unconstitutional statute by amendment in 60 L. R. A. 564.

3. The original section 11 (R. S. 12-645) whose defects rendered the act of 1917 abortive was amended in Laws 1927, ch. 99, the title to which read:

"AN ACT amending section 12-645, Revised Statutes of Kansas, 1923, relating to the protection from flood waters, and the method of paying therefor, and the assessment of special benefits that may accrue to property especially benefited by the construction of a storm sewer in cities of the first class, and repealing section 12-645, Revised Statutes of Kansas, 1923."

The amended section reads:

"The governing body shall appoint three disinterested householders of the said city to appraise any special benefits that may accrue to any property by reason of said improvement being made. Said appraisers . . . shall personally view, inspect and examine all lots and pieces of land liable to be specially benefited by said improvement being made. If, in their judgment, any lots and pieces of land will be specially benefited by said improvement being made, other than the benefits to the city generally, said appraisers shall report the same to the governing body, listing the lots and pieces of land specially benefited and the amount of special benefit to each. The same notices, public hearings, time for objections and appeals shall apply to said report as provided for the report of appraisers to assess damages as provided in sections 12-639-640-641-642 and 643 hereof. The governing body shall have the power to revise and correct said report if in its judgment any benefit appraised to a lot or piece of land is too much or too small, and when so revised, corrected and approved by the governing body, the special benefits so ascertained shall be

assessed against each lot and piece of land and collected the same as special taxes for sewers are collected: *Provided,* That should the benefits so ascertained exceed the cost of the improvement, a *pro rata* reduction shall be made to each lot and piece of land, so that the total assessments shall equal the cost of the improvement; and should the benefits so ascertained be less than the cost of the improvement, the remainder of the cost shall be assessed against the city generally, and said governing body shall provide for the payment of the said city at large portion of said bonds and the interest thereon as the same becomes due and payable, by the levy of a general tax on all the taxable property in said city." (R. S. 1931 Supp. 12-645.)

Before examining this act of 1927 and its title, it may be well to take note of successive amendments which have been made to original section 1 (R. S. 12-635) of the act of 1917. It was amended by chapter 95 of the Session Laws of 1925, and again amended in Laws 1929, ch. 107, as follows:

"An Act relating to the protection of cities from overflow of natural watercourses, amending section 12-635, Revised Statutes of 1923, as amended by chapter 95, Laws of 1925, and repealing said original section as amended.

"Section 1. That original section 12-635, Revised Statutes of 1923, as amended by chapter 95 of the Laws of 1925, be and the same is hereby amended to read as follows: Section 12-635. That the governing body of any city of the state of Kansas in or near where there is, or through which there flows, a natural watercourse, the overflow from which in the event of high water is liable to cause injury to any bridge, street, alley, public or private property, may, in order to prevent said injury, acquire by condemnation and eminent domain, or purchase, within or without said city limits, within five (5) miles therefrom, the land and easements necessary to construct drains, canals and artificial watercourses, or to widen and straighten existing drains and watercourses, or to construct the necessary levees and embankments, and may change and raise the grade of streets and alleys and the approaches to bridges, and raise said bridges, or construct bridges where necessary, and may widen existing drains, channels and canals, and acquire the necessary outlets therefor beyond the limits of the city, and may cause any and all other necessary work, construction and improvements to be made to protect said city and public and private property therein located from floods and damage by overflow of said natural and artificial watercourses: *Provided, however,* That none of the provisions of this act shall be held or construed to repeal or affect the power of drainage districts now organized under the provisions of chapter 215 of the Session Laws of 1905; *And provided further,* That this act shall have no force or application in cities through which flows a navigable stream."

It will be observed that the title to the act of 1927 quoted above, indicates a purpose of authorizing the assessment of special benefits which may accrue to property *by the construction of a storm sewer in cities of the first class.* The act itself, quoted above, says nothing about storm sewers, but gives methodical directions for the

assessment of special benefits accruing to "lots and pieces of land liable to be benefited by the improvement to be made," that is, by a flood-control improvement so authorized by the act of 1917. It is elementary, of course, that whatever features of the title of an act are wanting in its text may be ignored; and whatever material matter in the act is not fairly indicated by its title is void. In *State, ex rel., v. McCombs*, 129 Kan. 834, 838, 294 Pac. 618, it was said:

"The title may be broader than the act itself, but the act may not be broader than the title. [Citations.]"

It would seem that the purpose of the act of 1927 (ch. 99) is clearly expressed in its title by these words:

"AN ACT amending section 12-645, Revised Statutes of Kansas, 1923, relating to protection from flood waters, . . . and repealing section 12-645, Revised Statutes of Kansas, 1923."

But since the text of this statute has nothing to say about storm sewers the words in the title relating to "the assessment of special benefits that may accrue to property especially benefited by the construction of a storm sewer in cities of the first class" must be regarded as impertinent surplusage. In this view the title and text of the act of 1927 are sufficient to cure the defect in the original section 11 of the act of 1917; and it must be held that, so far as concerns the present actions, the amendment of 1927 to the act of 1917, in title and text, is valid.

4. One objection to the act of 1917 with all its amendments, which is stressed by counsel for plaintiffs and which seemed serious to the trial court, is that the statute contemplates that the flood-control project may be undertaken for the benefit of public and private property; and it is suggested that eminent domain cannot be invoked for the benefit of private property. The progress of the law has put some limitations on that doctrine. Following the disastrous floods in 1903 and 1904, which devastated the valley of the Kaw, legislation was enacted (Laws 1905, ch. 215) which authorized the creation of flood-control districts (called drainage districts) whose principal purpose and function is to protect private property from floods, and where the protection of public property, bridges, schools, and the like, is or may be an inconsequential proportion of the protection afforded. Any such drainage district was given the power of eminent domain, the theory being that when a great amount of private property requires protection

against recurring hazards of inundation any such hazard may become a matter of public concern, and the power of eminent domain may rightfully be exercised, because the public welfare is in fact affected. See Laws of 1905, ch. 215, and successive amendments thereto; R. S. 1923, ch. 24, and annotations; R. S. 1931 Supp., ch. 24, and annotations. In *Roby v. Drainage District*, 77 Kan. 754, 757, 95 Pac. 399, the first of many cases requiring our attention after the enactment of the statute of 1905, this court made note of the fact that public property of the city of Topeka was included with private property in the drainage district under consideration; and, indeed, it is hardly conceivable that in any of the various drainage districts organized to provide flood control in this state in the last twenty-five years there would be an entire absence of public property; and it may be taken for granted that assessments and benefits have been imposed thereon and charged thereto as is done in the construction of the more familiar types of special improvements, like street paving, sewers and sidewalks. (*Comm'rs of Franklin Co. v. City of Ottawa*, 49 Kan. 747, 31 Pac. 788.) In this case of *Roby v. Drainage District,* supra, it was said:

"The power of the legislature to create districts for the purposes of drainage and to provide for assessments to be made therein by the drainage board to pay for such improvements cannot be successfully questioned. (*Ross v. Supervisors,* 128 Iowa, 427, 104 N. W. 506, 1 L. R. A. n. s. 431 and note.) This may be done through a corporation thus organized, or through county or township boards (Gen. Stat. 1901, ch. 34), or by carrying sewer districts as provided in the laws governing cities. When the nature of the case does not conclusively fix it, the power to determine what shall be the taxing district for any particular burden is a legislative power, not restricted except by constitutional limitations. (1 Cooley, Tax., 3d ed., 234.) The benefits of a highway, a levee or a drain may be so peculiar that justice would require the cost to be levied upon a part of a township or county, or upon parts of several subdivisions of the state."

In our examination of the statute of 1917 and its various amendments we are unable to discern such infirmities in it as would vitiate any and every flood-control project which might be undertaken under its provisions. A city may be so situated that the only practical means of averting its flood hazards would be by some engineering project, to pay for which all real property within the corporate limits, public and private, should be charged with benefits and burdens fairly assessed and imposed. But the city of Salina may not be so circumstanced. At least, this court cannot take judicial

notice of that fact, and the trial court's pertinent finding on this point reads:

". . . The evidence shows, and the court finds, that the principal benefit from the construction of the Smoky Hill river project will accrue to private property in the city of Salina lying east of the Smoky Hill river. . . .

"The principal damage from flood waters is to the real estate over which it flows. The principal benefit of flood control is to real estate.

"Under the proceedings contemplated by the city all of the cost of the improvement except such as might be assessed to the lots and tracts of real estate specially benefited, must be raised by the assessment of real estate not benefited and by the assessment of all the personal property in the city. . . ."

In the limited review permitted to this court because of the want of a transcript and the want of a motion attacking this finding of fact, this court is bound to hold that this finding cannot now be disturbed, and of necessity it must control our disposition of these appeals.

In its findings of fact and conclusions of law the trial court referred to a number of other objections to the proceedings as undertaken and contemplated by defendants. One question raised by the litigants and left undecided related to a proposed construction of a bridge to cost $48,000 as a part of this flood-control project without submitting that detail to a vote of the people. But neither party complains because this question was left undecided, so this matter is not open to review. (But see R. S. 10-201, 10-202 and 13-1034.) Other matters raised by the pleadings upon which no ruling was made, and as to which no complaint was made below, are not subject to appellate review.

To summarize: The statute of 1917 was merely inoperative and not wholly unconstitutional because of the defects and insufficiency of section 11 to make proper provision for the assessment of benefits and for the proper apportionment of the costs to the public and private property within the city to pay for the projected improvements. We also conclude that the amendment to section 11 of this act of 1917, in chapter 99 of the Laws of 1927, was enacted in conformity with the constitutional requirement of article 2, § 16; and so far as suggested by the briefs and arguments of counsel that amended section (Laws 1927, ch. 99, R. S. 1931 Supp. 12-645) is valid and sufficient to make the statute operative. The fact that both public and private property are to be benefited by the proposed flood-control project does not render it illegal, provided each kind of property is fairly charged with the benefits accruing thereto and its

proper share of the cost of the improvements fairly assessed against it. But real property within the city not subjected to flood hazard, or which will receive no practical benefit from the projected improvement, cannot be taxed for its construction. It must also be held that the general mass of *personal* property within the city cannot be taxed to pay the cost of this flood-control project where the property to be benefited thereby is wholly or principally real estate. The fact that private property is to be the principal beneficiary of a flood-control project does not render such project one of mere private concern nor forbid the authorization of the power of eminent domain to accomplish it.

The other objections to the judgments have all been noted. None of them was of sufficient gravity to change the result, nor do they justify further discussion.

The judgments are affirmed.

BURCH, J., not sitting.