No. 36,699

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JOHN-
SON, as the Governing Body of Mission Township Main Sewer
District No. 1, in Johnson County, *Plaintiff*, v. GEORGE ROBB, as
Auditor of the State of Kansas, *Defendant*.

(171 P. 2d 784)

Opinion filed July 20, 1946.

*F. L. Hagaman,* of Kansas City, argued the cause, and *Rolla W. Coleman,*
of Mission, and *Clayton Brenner,* of Olathe, were on the briefs for the plain-
tiff.

*Harold R. Fatzer,* assistant attorney general, and *Maxine Virtue,* assistant
attorney general, argued the cause, and *A. B. Mitchell,* attorney general, was
on the briefs for the defendant.

The opinion of the court was delivered by

THIELE, J.: This is an original proceedings wherein the plaintiff
seeks a peremptory writ of mandamus to compel the auditor of the
state to register sewer district bonds. The cause is submitted on the
defendant's motion to quash the plaintiff's motion for the writ for
the reasons that the statute relied upon by plaintiff is unconstitu-
tional on four grounds, and that the election proceedings were ir-
regular in one particular, all of which reasons will be detailed later
herein.

The bonds in question were issued under the authority of the
Laws of 1945, chapter 179, appearing as G. S. 1945 Supp. 19-2731
to 19-2752, both inclusive. In references hereafter made we shall
refer only to chapter and section number as the same appear in the
supplement. Although the statute will be more specifically referred

to later, for present purposes, it may be said that it provides for the creation by act of the board of county commissioners in any county having within it a township with a population of over five thousand or more of main sewer districts, for the construction of main and lateral sewers and disposal works and for the issuance of bonds to pay the costs thereof.

The motion for the writ states that Mission Township Main Sewer District No. 1 in Johnson county is a body corporate under the above statute, and that pursuant to an election held March 12, 1946, it had issued its Series A Sewer Bonds in the principal sum of $1,100,000, and that on June 18, 1946, it had filed with the defendant Robb, the auditor of the state of Kansas, a full and complete transcript of the proceedings leading up to the issuance of the bonds, and requested him to register the bonds, and that he had refused. A copy of the transcript was attached to and made a part of the motion for the writ. Other allegations are more or less formal and need not be detailed. The prayer is that the auditor be ordered to register the bonds. The transcript of the proceedings need not be fully reviewed for there is no contention that if the statute be valid, the plaintiff did not follow statutory provisions fully and completely with this exception on which the auditor relies, in part, as justification for his refusal to register the bonds. Under the statute the board of county commissioners, hereafter called the board, created the drainage district and constituted its governing body. Under its direction engineers had made a survey and had prepared preliminary plans of the proposed improvement and an estimate of the cost thereof, and had filed their report. This report came on for consideration at a meeting of the board on January 23, 1946, and the board then adopted a resolution setting forth certain portions of the contemplated improvements, one of the items being "Item III. A treatment and disposal plant, plant site and equipment therefor *to be located near Turkey Creek and Roe Boulevard in Wyandotte County, Kansas,* as more fully described in said reports, . . ." (Italics supplied.) Thereafter an election to vote upon issuance of bonds was called for March 12, 1946. The election notice set out the boundaries of the district and listed the proposed improvements. Under Item I is a listing of twelve main trunk sanitary sewers, with the estimated cost of each. Under Item II are two projects not presently involved, and under Item III is the treatment works "in the Turkey Creek Valley near Roe Blvd., in

Wyandotte County, Kansas," at an estimated cost of $414,000. There is no separation of cost of site, construction of necessary buildings, necessary equipment, etc., in connection with Item III. The form of ballot used, however, was substantially that provided by 19-2735, and contained no reference to where the sewage treatment or disposal plant was to be located. At the election 1935 votes were cast in favor of the proposition and 878 votes were cast against it. At a meeting held June 12, 1946, the board considered objections made to constructing the disposal plant in Wyandotte county, there being threatened litigation with respect to its acquisition, and found that another suitable site in Johnson county and approximately a quarter of a mile from the original Wyandotte county site was available, and that the Johnson county site could be procured without condemnation, and although the cost would be greater, the over-all cost would be within the total authorized bond issue, and it directed that the Johnson county site be acquired. The record discloses nothing altering any plans previously approved.

It may also be said that the bond transcript discloses the following facts: The territory incorporated in the sewer district is densely populated and includes approximately seven thousand acres in the Brush Creek watershed in Mission township in Johnson county, and includes no part of any incorporated city. The territory is without permanent or adequate sewage disposal facilities and is confronted with a serious health problem, the state board of health having refused to approve further septic tank installations. The chief sanitary engineer of the state board of health certified that he had examined the petition for incorporation and that none of the lands included was served by any existing sewer and no lands included should be excluded. In a supplement to plaintiff's original motion for the writ is an expanded statement with reference to the lands included in the district, that the lands comprise a residential section in close proximity to Kansas City, Kan., and Kansas City, Mo., and that water, gas, electric and telephone service is available, but that no permanent sewage disposal system exists; that the state board of health had warned that a serious menace to health existed and that a sewage disposal plant must be provided, and had made an order that no individual septic tanks would be approved. The 1945 census in the following counties and townships is also set forth:

| "County | Township | Population |
|---------|----------|-----------|
| Sedgwick | Delano | 6,344 |
| | Riverside | 19,268 |
| Wyandotte | Quindaro | 7,510 |
| | Shawnee | 7,151 |
| | (Wyandotte | 4,785) |
| Johnson | Lexington | 5,019 |
| | Mission | 18,258 |
| | Shawnee | 6,842 |
| Shawnee | Topeka | 8,513" |

A photographic map is also made part by reference. It shows the boundaries of the district. They do not constitute continuous straight lines, but in a general way it may be said the district is about five miles long north and south and four miles wide east and west, at its extremities.

As grounds for his motion to quash, the auditor alleges that the act under which plaintiff has acted is unconstitutional for the following reasons: (1) It violates article 2, section 17 of the state constitution. (2) It purports to levy a general tax which is unconstitutional in that it violates article 11, section 1 of the constitution. (3) It provides for levies against only the lands and improvements, thereby constituting an inequitable, arbitrary and discriminatory method of financing not related to the benefits to be received by the property against which the levy is made and thus violates article 11, section 1 of the constitution. (4) The provisions of 19-2742 subjecting the entire main sewer district to a levy to pay defaulted lateral sewer district assessments violate article 11, section 1 of the constitution, and existing statutes governing municipal financing by the issuance of bonds. (5) The board contemplates departure from the procedure with reference to the disposal plant as set out in the election notice and hence contemplates departure from the action authorized by the voters at the bond election, so that the bond transcript does not show such legal proceedings as will authorize the auditor to register the bonds. These various contentions will be taken up in order.

Preliminary to our discussion we note that the board and the auditor direct our attention to many of our decisions and to other authorities. Many of the decisions are in a sense cumulative. We shall make no attempt to refer to many of them as they have been referred to and discussed in those which we cite.

1. The first matter for consideration is whether the statute in

question violates article 2, section 17 of our state constitution. The argument runs that although the title and language of the act is so used that the act is a general law, by reason of definitions in the act, a classification is made that is arbitrary, fictitious and without substantial basis with the result that the act is not uniform in operation on all persons and things standing in the same situation and circumstances. This contention is predicated on the following: Under 19-2732 the county commissioners of any such "county" shall have power to establish main sewer districts, and to execute and carry out the construction of certain public sewer improvements. Under the preceding section 19-2731, the word "county" is defined to mean "any county having within it a township with a population of five thousand or more, outside the limits of any incorporated city or town." It is said that the quoted language creates a classification that is unreasonable and arbitrary; that the act is special and not general; that a general act could have been made applicable, and the act under consideration violates the constitution. In support of his contention the defendant cites *Patrick v. Haskell County*, 105 Kan. 153, 159, 181 Pac. 611 (county seat location); *Ashley v. Wyandotte County Comm'rs.*, 121 Kan. 408, 247 Pac. 859 (bridge law); *State, ex rel., v. Deming*, 98 Kan. 420, syl. ¶ 3, 158 Pac. 34 (city court act); *Owens v. City of Coffeyville*, 151 Kan. 263, 98 P. 2d 415 (civil service act); *Panhandle Eastern Pipe Line Co. v. Miami County Comm'rs.*, 151 Kan. 533, 99 P. 2d 828 (act for reimbursements); *Berentz v. Comm'rs. of Coffeyville*, 159 Kan. 58, 152 P. 2d 53 (city pensions); and *Barker v. Kansas City*, 149 Kan. 696, 88 P. 2d 1071 (parking stations). The above cases discuss the general problem under consideration, but it may not be said that any is decisive in the case at bar. To this list could be added many other decisions as a reference to the annotations to the constitution article 2, section 17, in the general statutes will disclose.

A question similar to the one now presented, but containing other and further matter of objection, was considered in *Barker v. Kansas City*, supra, and in the opinion in that case may be found a review of some of our decisions bearing on the question whether an act is general or special. It was there held:

"In determining whether a law enacted by the legislature contravenes the provisions of section 17 of article 2 of the state constitution that all laws of a general nature shall have a uniform operation throughout the state, and in

all cases where a general law can be made applicable, no special law shall be enacted, the following tests are to be applied:

"(*a*) If a law of general form operates uniformly on all members of the class to which it applies, it is not open to the objection it is a special law if the classification is not an arbitrary and capricious one.

"(*b*) If a law applying to a specified classification of cities or governmental units is otherwise general in 'its form and its provisions are such that in the ordinary course of things the law might and probably would apply to other cities or governmental units coming within the specified classification, the law is a general and not a special law.

"(*c*) Although the title and form of a law may be general, whether a general or special law has been enacted is to be determined by what in the ordinary course of things must necessarily be its operation and effect.

"(*d*) If a law otherwise general in form and title, and presently applying only to one city or governmental unit, contains a limitation of time in which there can be operations under it, so that there is little or no probability it could or would ever affect any other city or governmental unit, it is a special law." (Syl. ¶ 1.)

The tests there stated have been applied in subsequent decisions. See *Panhandle Eastern Pipe Line Co. v. Miami County Comm'rs,* supra; *Thompson v. Reno County Comm'rs,* 152 Kan. 610, 106 Pac. 700; *Rural High School v. Brown County Comm'rs,* 153 Kan. 49, 109 P. 2d 154; *Miltonvale Rural High School v. Community High School,* 153 Kan. 756, 113 P. 2d 1095; *State, ex rel., v. Allen County Comm'rs,* 156 Kan. 248, 133 P. 2d 165; *Berenz v. Comm'rs of Coffeyville,* supra; *State, ex rel., v. Schoeppel,* 160 Kan. 396, 162 P. 2d 80; and possibly others. And many of the above cases also emphasize that the classification made must be germane to the subject matter of the statute and based upon a real and substantial distinction.

Cases heretofore cited hold that classification by population is ordinarily a natural and reasonable one, and that, if not otherwise objectionable as being arbitrary and capricious, such a classification does not make an act a special one. An application of the rules of construction mentioned to the facts here present shows that there are four counties having eight townships of a population of over five thousand. The act contains no limit of time for its operation. The trend of population has been toward cities and away from purely rural communities for some time. It was not unreasonable for the legislature to assume that with the passage of time other townships would increase in population and come within the purview of the act. Although the political townships of the state are not coincident in their boundaries with governmental townships, it is well known that the ordinary political township having a

population of five thousand or over may well be said to be rather densely populated. That more adequate means of disposal of sewage is needed in a densely settled region than in a sparsely settled one is well known, and the classification made bears a direct relation to the end sought to be accomplished by the act in question. Of course it may always be argued an act is arbitrary where a population limit is set. For instance it may be argued that because a township having a population of only 4,750 is excluded, the classification is capricious and without basis in law but it must be borne in mind that in any classification there may be exclusions of units close to the limitation. But if a population figure may be set, and such a figure has been set in all of our general city acts, as well as in many others, the question is whether that figure was reasonable, bearing in mind the purpose to be accomplished by the act. It is clear that the act operates uniformly on all counties having townships of over five thousand population. It appears that there is definite relation between density of population and need for sewage disposal systems. The purpose to be accomplished by operation of the act is germane to the classification made, and the act may not be stricken down for the asserted reason the classification is arbitrary, capricious and unreasonable and therefore the act is a special one, and that a general act could have been passed.

We have not overlooked the auditor's further contention that the limitation of population of "5,000 or more outside the limits of any city" must mean first and second class cities, as third class cities are parts of the township within which they lie, and thus a further classification is made. This contention cannot be sustained. The statutory language is "outside the limits of any *incorporated* city or town." The legislature recognized that adequate provision has already been made for sewage disposal systems in cities, and they ought not to be included in the new act. Neither have we overlooked the argument that Johnson county could have built a sewage disposal plant under the provisions of G. S. 1945 Supp. 19-2704 to 19-2715 inc., which defendant concedes is a general law and that therefore a general law can be made applicable. We need not pursue this argument for we hold the act now in question is a general law. The fact there may be two general laws does not make either bad. By its express provision the instant act (19-2752) is supplemental to any existing law. (See the many provisions of our city

laws pertaining to public improvements which to certain extents overlap each other.)

2. The auditor contends that the tax imposed by 19-2735 and 19-2736 is a general tax which does not operate upon all tangible, taxable property in the sewer district, and such a classification is in violation of article 11, section 1 of our constitution requiring a uniform and equal rate of taxation. In a general way it may be said that 19-2735 provides that regardless of the outcome of the election to determine whether the improvement should be made, the board shall have authority to make a tax levy on the assessed value of lands and improvements within the district to pay in one installment certain expenses, and further that principal and interest on bonds voted and issued shall be defrayed out of funds raised by taxes levied on the lands and improvements. Under 19-2736 is a further provision that the board shall fix a levy applied to all lands and improvements to pay principal and interest on bonds coming due. The argument is that prior to the amendment in 1924 of the constitutional provision noted, this court had upheld classification of a tax against lands and improvements to the exclusion of a tax against all taxable property (*Comm'rs of Ottawa Co. v. Nelson,* 19 Kan. 234, involving liability on township bridge bonds) but that since the amendment there could be no such classification (*Voran v. Wright,* 129 Kan. 1, 281 Pac. 938). The contention thus made need not be pursued. Although the word "tax" is used in the act, we first examine whether in fact any "tax" is to be levied under the act in question. Is the money to be raised to be used for the benefit of the public generally, or is it to be used to pay for installations of special benefit to the land and the improvements thereon? Is the word "tax" as used in the statute a misnomer, and was assessment or special assessment intended? In *Railway Co. v. Railroad Co.,* 75 Kan. 167, 88 Pac. 1085, the question was whether assessments for local improvements made against property specially benefited thereby were included within an agreement to pay taxes. In the course of the opinion it was said there is a well-understood difference between general taxes levied for the support of the government and special charges for betterments. The court held:

"The word 'taxes' has two well-recognized meanings, one inclusive and the other exclusive of special assessments for local improvements. Which meaning is intended where the word is used in a written contract must be determined by the context." (Syl. ¶ 1.)

A somewhat converse proposition was considered in *Tull v. Royston*, 30 Kan. 617, 2 Pac. 866 where the question was the liability of a grantor in a deed, who conveyed lands warranted to be free and clear of incumbrance, where it was held that an assessment due for sidewalk improvements did not become a lien until a certain date. It was there said that while special assessments for improvements in cities are not taxes under article 11, section 1 of the constitution, yet they must be construed to be taxes within the purview of a statute requiring them to be certified to the county clerk and to be placed on the tax rolls to be collected in like manner as other taxes.

Although the language of the several statutes applicable makes it more clear than in the one now under consideration, there are many instances wherein the value of real estate, with or without improvements, and without regard to personal property, is the basis for determining the charge to be made against the real estate for public improvements such as sidewalks, pavements and sewers. Another instance where the legislative intent is more clearly expressed may be found in a statute pertaining to drainage districts where provision is made for authority to levy a general tax to create a general fund, and to levy assessments and special taxes (G. S. 1935, 24-407, *Eleventh, Twelfth*). Under that statute assessments are made upon real estate. So far as we are aware it has never been contended that because the word "tax" was used in these statutes, that made the special assessment a tax within the meaning of the constitutional provision mentioned, and that the statutes were therefore invalid. The statute under consideration provides first that the cost of construction of the main trunks and sewage disposal plants shall be raised by the issuance and sale of bonds, and that the board shall fix a levy, applied to the valuation of real estate including lands and improvements, to raise the necessary money to pay principal and interest as such payments come due (19-2736). But it is clear from that section and other parts of the act that the moneys so raised are to pay for benefits to the real estate and are not to be used for general public purposes. The statute also provides for construction of lateral sewers, the cost to be spread equally per square foot over all the land within the lateral sewer district, to be collected "in addition to other taxes and assessments," and further that the board may spread the cost over a period not to exceed twenty years "instead

of levying the entire tax or special assessment for such cost at one time." There is further provision for publishing notice of apportionment of cost and fixing a time within which "such assessments may be paid in full without interest." And other references to "assessments" may be found in the section (19-2737).

Our attention is also directed to authorities from other states and to quotations from text writers, which will not be further mentioned. We think it clear that the statute contemplates, not a tax for general governmental purposes, but a means of ascertaining amounts due for improvements made benefiting particular tracts of real estate, and that practically, the so-called tax is no more than a special assessment to pay for the improvement and not a tax within the purview of article 11, section 1 of our constitution. Under such circumstances the constitutional provision has no application. (See *Hines and others v. City of Leavenworth and others,* 3 Kan. 186; *Comm'rs of Ottawa Co. v. Nelson,* 19 Kan. 234; *Comm'rs of Franklin Co. v. City of Ottawa,* 49 Kan. 747, 31 Pac. 788, 33 Am. St. Rep. 396; *City of Wichita v. Board of Education,* 92 Kan. 967, 142 Pac. 946.) We conclude that the statute under consideration does not violate the above provision of our constitution for the reasons just considered.

3. Defendant then says that if this court shall determine the tax authorized by the statute is a special tax or assessment, that as such it is arbitrary, unreasonable and unconstitutional as it is levied upon property in the district without regard to benefits derived from the construction of the main trunk sewers, which cannot be equally available or accessible to all lands within the district.

Although the defendant presents this contention as a matter of law, he ignores the findings of the board, included in the record, that based upon the reports of its engineers, the county engineer and the chief sanitary engineer of the state board of health the proposed main sewers will serve not merely the lands immediately abutting thereon but will constitute an integral part of the sewers serving the entire district and will best serve the needs of all lands within the district.

In support of his contention defendant cites *Alber v. Kansas City,* 138 Kan. 184, 25 P. 2d 364. There a sewer was built as a result of a contract between a drainage district and the city, which created a sewer district and levied assessments against the lots in it to pay a share of the costs. The ordinance required assessment of special benefits. Our attention is directed to the language following:

"Until the plan is so far carried out that owners of property in the district have access to the sewer and may derive benefit therefrom, their property cannot be assessed to pay for sewer construction. Special benefits are essential to the validity of an assessment in such a case. No lawful assessment can be levied against a lot owner who is not specially benefited. His property cannot be assessed for a general benefit shared in by the public at large. Of course any landowner who has access to the sewer now built and to whom special benefits are available, may be required to pay for such benefits. If within a reasonable time subsewers or laterals are built in completion of the system which will afford the lot owner sewer benefits, assessments may then be made upon his property. It is not necessary that a sewer shall be completed in a brief time. It may be built in sections. As fast as a section of the plan is completed assessment may be made on the property then benefited." (l.c. 191.)

It may be observed the main sewer involved in that case was constructed under a contract authorized by an ordinance fixing assessments, and provided for a situation in some ways analogous to that here presented and in other ways widely different. What was said in the above quotation was in connection with proof in evidence by the plaintiff that the main sewer did not and could not benefit him.

Defendant also directs our attention to *Gilmore, County Clerk, v. Hentig*, 33 Kan. 156, 5 Pac. 781; *Botts v. City of Valley Center*, 124 Kan. 9, 257 Pac. 226; *Putnam v. City of Salina*, 136 Kan. 637, 17 P. 2d 827; and to authorities from other states to the effect that assessments made for public improvements are valid only when the improvements confer special benefits on the property assessed, and that such is a general rule is conceded. But it is equally well recognized that the legislature is vested with discretion as to how public improvements shall be made and paid for, so long as the methods used do not violate constitutional limitations. See *Simpson v. Kansas City*, 46 Kan. 438, 26 Pac. 721; *Coates v. Nugent*, 76 Kan. 556, 92 Pac. 597; *Roby v. Drainage District*, 77 Kan. 754, 95 Pac. 399; *Railroad Co. v. Leavenworth County*, 89 Kan. 72, 130 Pac. 855; as well as the cases above mentioned.

What was the power of the legislature in the present instance? It had a situation before it which it deemed warranted legislation. It was aware that before lateral sewers could be built, provision had to be made for the construction of main sewers and for disposal of the sewage. The statute under consideration expressly provides for that to be done, and that after the main sewer district has been incorporated and bonds voted to pay for constructing the main trunk sewers, upon presentation of requisite petitions lateral

sewer districts may be formed (19-2737). We think it was within the power of the legislature to provide such a method of construction and for such an assessment to pay for the main trunk sewers and disposal plant, which would be of value and benefit to all lands within the district. Such a power has been exercised in authorizing cities generally to pay for designated portions of main sewers or to divide the cost thereof with a sewer district (G. S. 1935, 12-619); in authorizing cities of the first class to construct main and intercepting sewers and to tax the cost to the district benefited (G. S. 1935, 13-1013); and a somewhat similar provision is made as to cities of the second class (G. S. 1935, 14-516 to 14-521, inc.).

Under a subhead, the auditor directs our attention to the provision of 19-2737 that the cost of lateral sewers shall be spread equally per square foot over all the land within the lateral sewer district, and contends this provision provides an arbitrary, unreasonable and discriminatory method of determining benefits, in support of which he cites cases previously mentioned. It may be noted that only bonds of the main sewer district are involved in the present action. So far as the record discloses no lateral sewer districts have been organized, or if they have, no bonds of any of that class have been tendered for registration. We examine the lateral sewer district feature only to determine whether any provisions with reference to such a district makes the entire act invalid. The contention is supported by an illustration that an owner of a tract of two thousand square feet improved with a dwelling would pay twice as much as would the owner of a tract of one thousand square feet similarly improved. If this were a test, the owner of real estate which had not been improved, and which had no present need for a sewer connection, would pay nothing. Benefits from installation of a sewer system arise not only from use, but from availability for use. The construction of a sewer benefits real property, just as does paving of streets and the laying of water mains. The property is more valuable because the improvements are made.

We are not aware of any statute which provides that assessments to pay for sewer installation depend on amount of use, or that an assessment is invalid prior to the time the sewer is actually used. The record before us indicates that parts of the lands included in the main sewer district have been rather fully developed by the erection of dwellings; that other parts are partially developed and still other parts are awaiting development. The whole district

benefits from the construction of main sewers. As has been indicated no lateral sewer districts have been organized.

As appears from some of the authorities previously mentioned, the legislature is vested with discretion in determining the exact manner by which public improvements are to be financed and paid. We are of the opinion the provision pertaining to lateral sewer districts that the cost of lateral sewers shall be spread equally per square foot over all the lands within the district, may not be declared to be arbitrary, unreasonable and discriminatory, so as to render the statute under consideration unconstitutional and invalid for the reasons considered under this heading.

4. The auditor urges that the provision of 19-2742 hereafter quoted, subjects the entire main sewer district to a levy to pay defaulted lateral sewer assessments, and violates article 11, section 1, of the constitution and existing statutes governing municipal financing by the issuance of bonds.

In a preliminary way, it is to be noted that by reason of G. S. 1935, 10-112, all bonds issued by the main sewer district are general obligation bonds, and that they are such is recognized in the present statute defining the term "main sewer district" as one constructing specified improvements to "be paid for by general obligation bonds of the entire main sewer district" (19-2731). It is to be noted also that the statute, speaking generally and ignoring particulars, provides for incorporation of a main sewer district, for proposed improvements and an estimate of cost, and for an election to issue bonds of specified amounts to pay for the improvement (19-2732 to 19-2737 inc.). The bonds mature serially over a period of not to exceed twenty years. After the main sewer district has been incorporated and the bonds voted, then upon requisite petitions being filed lateral sewer districts may be created, and the cost spread equally per square foot over the land included. The board is given an option to provide for a single assessment or to spread the cost over twenty years. After the cost has been determined and apportioned, notice must be published showing the apportionment and fixing a thirty-day period in which "assessments may be paid in full without interest," and after that time has expired the board may issue and sell bonds "of the main sewer district" for the amount of the unpaid assessments (19-2737). The act further provides all special assessments against the individual lots and parcels of land in any lateral sewer district shall bear a

certain rate of interest, and that "all principal and interest collected on special assessments shall be placed to the credit of the bond and interest account of the particular bond issue to which such special assessments are incidental," and that any balance of the fund remaining after the particular bonds have been paid shall be placed in the maintenance fund of the main sewer district (19-2742). Then, as a part of the above section follows this language, which forms the basis of the auditor's contention:

"If at any time there is a deficit in any such bond and interest fund, then the governing body shall make such tax levy on the assessed valuation of all lands and improvements in the main sewer district as is necessary to raise the required funds to pay the deficit and pay the principal of the bonds and the interest in full."

The auditor's brief is an extended argument covering in part matters already considered under part 2 of this opinion, and directing attention to the fact the main sewer district is to be charged with any deficit arising in the bond and interest fund of the lateral sewer district. It is contended that such a provision is illegal in that it constitutes an unlawful general tax to pay a burden which can only be borne legally by special assessments against the property to be benefited. The argument is anticipatory for only the future will determine whether there is any deficit or any occasion for the board to invoke the provision of which complaint is made. The auditor illustrates his argument by calling attention to the possible liability of an owner in one lateral sewer district for default arising from unpaid assessments in another district and directs our attention to authorities, which need not be reviewed. The argument properly stresses deficits, but ignores the fact that the assessments are collectable as other taxes, and that if any lot owner fails to pay, either the whole assessment if levied at one time, or an installment thereof if bonds be issued, his real estate would be foreclosed and the deficit made good from proceeds of the sale. Possibly the latter feature has little to do with constitutional validity, but that it was considered by the legislature in enacting the statute seems rather clear. The legislature was aware that under then existing statutes provision was made for public improvements such as paving and sewer projects, and works performed by drainage districts, to be paid for by owners of real estate specially benefited, and not by the entire city or district, for assessments of costs to specific tracts and for the issuance of bonds to pay unpaid as-

sessments, and that those bonds were general obligations of the issuing body; and that if a sufficient number of defaults were made in the payment of assessments, so that funds were not available to fully retire the bonds, any bondholder could reduce his claim to judgment, which the issuing body would have to pay by general tax usually, in which event persons not directly benefited would have to contribute. That such was a valid and constitutional method seems not to have been challenged. If such a challenge were made and sustained, the integrity of every special improvement bond would be impaired. As we construe the present statute, the legislature simply provided a shorter way to take care of any liability of the district on its general obligation bonds that might arise, if through default of persons assessed, there might not be sufficient moneys in the bond and interest fund to retire outstanding, unpaid serial bonds and interest. While the method provided parallels the situation existing under other previous statutes for the making of public improvements to be paid for by assessment against the lands specially benefited, if in fact it did not correspond it could not be stricken down simply because a new method of financing may have been devised. The auditor also says that the method of financing interferes with the budgeting of funds; that the method produces confusion and that it is impossible to determine from the bond transcript whether the bonds are valid since the so-called general levy sought to be imposed affects the funds out of which the bonds are to be paid. We do not agree. It may or may not happen there will be a deficit in the bond and interest fund but if there is, all that the statute contemplates is that an assessment be made on the real property and improvements in the main sewer district to meet any shortage there may be between the amount of funds actually collected and the amount for which the district is liable on its general obligation bonds. We conclude that the contentions made by the auditor under this heading cannot be sustained.

5. The auditor's last contention is that inasmuch as the notice of election to vote bonds set out the site of the sewage disposal plant as being in Wyandotte county, as well as the cost, and the board now contemplates obtaining a different site in Johnson county at a greater cost, this constitutes an illegal departure from the action authorized by the voters. Before discussing the proposition, it may be said that a change of site may be in contemplation, but actually no change has been made so far as the record before us

discloses. We have heretofore stated the facts about the election notice, and subsequent action about change of site, and they need not be repeated.

Under 19-2735 it is provided that before the improvement is made certain preliminary acts are required and that the proposition be submitted to the voters, and that notice of the election be given by publication. The notice must state the aggregate amount proposed to be expended and the amount of bonds and, "Such election notice shall state in reasonable detail the boundaries of such district . . . and shall state the estimated cost of building of such main trunk sewers and the approximate location and extent thereof and of the method and means of disposal of sewage therefrom . . ."

It is not contended that the election notice did not comply fully with this statutory requirement. It is contended that by this notice, the site of the disposal plant was to be in Wyandotte county, and that to put the site in Johnson county is fatal to the project. Coupled with this contention is that locating the disposal plant in Johnson county will increase the cost. The map of the district, which is a part of the record before us, discloses that the Wyandotte county site is only a short distance north of the north line of Johnson county, and that the alternative site borders the north line of Johnson county, and at points of closest proximity is less than one-quarter of a mile from the Wyandotte county location.

When it is borne in mind that the district at its extremities is about five miles long north and south and four miles wide east and west, it can hardly be said that the alternative site is not within the statutory requirement of an "approximate location." Insofar as cost is concerned, it is true the board, in ordering acquisition of the Johnson county site, found its cost would be greater than for the Wyandotte county site, but it also found that the cost of all the improvements would be within the total authorized bond issue. We need not review the entire act but reference to its several provisions will show that engineers are to be employed to make surveys and *preliminary* plans, and *estimates* of costs, and for what may be called final plans and *estimates* of cost. The requirements of the election notice have been quoted above. The various items of the plan, with the estimate of cost of each, are not separately voted on—the vote is on the improvement as a whole. The estimates of cost are estimates only. One item may cost less than the

estimate, and another item may cost more, but the total cost is limited by the amount of bonds authorized. Insofar as the disposal plant is concerned, there is no separation whatever as to estimated cost of land, estimated cost of building, or of machinery and equipment. Conceivably, any additional cost between one site and another is the difference in the cost of real estate. But whatever difference there may be, and for whatever item, the record contains a finding the over-all cost will be within the total authorized bond issue, submitted to and approved by the voters. The auditor interprets the provision of the statute requiring notice of the election in such manner that it would not be necessary to give any estimate of cost of the disposal plant, but we shall not labor that phase. He does, however, interpret the notice of election given as requiring that the site of the disposal plant be in Wyandotte county and not in Johnson county, and hence argues that the notice of election although definite and not misleading, as he interprets it, by reason of the action of the board to acquire an alternative sight, actually becomes misleading, and that the voters did not intelligently vote on the improvement as the same will be made. In support he cites *Leavenworth v. Wilson,* 69 Kan. 74, 76 Pac. 400; *City of Iola v. Hobart,* 141 Kan. 709, 42 P. 2d 977; *Kansas Electric Power Co. v. City of Eureka,* 142 Kan. 117, 45 P. 2d 877; *Board of Education v. Powers,* 142 Kan. 664, 51 P. 2d 421; and other cases, all of which are distinguishable on the facts from the case at bar.

The case at bar discloses no situation where the voters were misled. We think the voters were fully apprized of the entire improvement proposed, and that the decision of the board, subsequent to the election, to acquire a site other than the one originally chosen, but within the approximate location, and at a cost, with the other improvements, within the amount authorized by the voters, did not warrant the auditor's action in refusing to register the bonds.

After the submission of this case, the auditor directed our attention to *Comm'rs of Wyandotte Co. v. Abbott,* 52 Kan. 148, 34 Pac. 416, wherein a statute, said to have permitted petitioners for a public improvement to determine absolutely and arbitrarily whether the improvement should be made, and to take from the board of county commissioners its discretion, exercise of judgment and supervisory control, was held to be unconstitutional as being an invalid attempt to delegate legislative powers. We shall not discuss

the question but remark only that the act now in question is not subject to the objections upheld in the foregoing case.

Upon the whole record, we conclude that the auditor's asserted reasons for refusal to register the bonds in question are insufficient in law and that his motion to quash should be denied.

The purpose of the auditor in refusing to register the bonds was to have the legal questions submitted determined, and that has been done.

The court will retain jurisdiction, and if the bonds are not registered within ten days from the filing of this opinion a writ of mandamus will issue. The costs are taxed against the plaintiff.