No. 39,445

The State of Kansas, on the relation of Harold R. Fatzer, Attorney General, *Plaintiff*, v. The Board of County Commissioners of the County of Wabaunsee, State of Kansas, and The Board of County Commissioners of the County of Pottawatomie, State of Kansas, *Defendants*.

(270 P. 2d 224)

Opinion filed May 8, 1954.

*Ralph W. Oman,* of Topeka, argued the cause and *Harold R. Fatzer,* attorney general, *William P. Timmerman,* assistant attorney general, and *James A. Mc-Clure, Robert L. Webb, Philip E. Buzick, Robert A. McClure* and *James D. Waugh,* all of Topeka, were with him on the briefs for the plaintiff; *Richard P. Royer* and *D. M. Sparks,* both of St. Marys, of counsel.

*James E. Parmiter,* county attorney of Wabaunsee county, and *Richard M. Pugh,* county attorney of Pottawatomie county, both argued the cause and were on the briefs for the defendants.

The opinion of the court was delivered by

Smith, J.: This is an original action in quo warranto by the state in the name of the attorney general, whereby the plaintiff asks us to oust two boards of county commissioners from exercising alleged, assumed and illegal powers having to do with the construction of a

bridge across the Kaw River, which flows between the two counties. Each of the two boards of county commissioners have answered and parties have stipulated as to the facts. The action has been submitted to us for final determination.

The Kaw River runs in a meandering line in a general easterly direction. Highway 40 and 24 runs east and west on the north side of and in a general way parallel to the river. Towns on Highway 40 and 24, of which we shall speak, are St. Marys and approximately six miles west, Belvue. Each town is about a mile north of the river. Wabaunsee county is on the south side of the river. Pottawatomie county on the north. The river flows between the two counties.

Prior to 1950 there were four bridges across the Kaw between these two counties. Two of them went out in 1950, a third one went out in the flood of 1951.

The petition alleges the two boards met in a joint session on August 27, 1951, to discuss the building of such a bridge, under the provisions of Art. 2, Chap. 10 of G. S. 1949; that it was agreed the county engineers of the two counties should proceed to select a favorable site and report to the two boards; that a site was selected at a point on the river approximately 2½ miles east of Belvue, which would be referred to as the East Proposed Site; that on September 17, 1951, the two counties made an agreement with a firm of engineers to prepare preliminary estimates for the cost of the bridge upon that site; that on January 31, 1952, at a joint meeting of the boards they were authorized to make an application for federal funds and both counties agreed to share the remainder of the cost equally; that on February 12, 1952, they requested a secondary road designation from the state highway commission in order that the north approach to the bridge might be upon a secondary highway and this request for a secondary road designation was at a location upon the site selected about 2½ miles east of Belvue; that on May 15, 1952, both counties were informed that the federal approval of the bridge project had been obtained and on June 12, 1952, at a joint meeting it was voted to hold an election on August 15, 1952, to determine whether bonds should be voted with which to build such bridge; that each board authorized such an election on the question whether each county would issue $250,000 to pay its respective cost of building a bridge at a point on the Kaw approximately 2½ miles east of Belvue; that the ballots

used stated the question was whether bonds should be voted to build a bridge at such site; that said elections were duly and regularly held in both counties the same day and by a more than two-thirds majority said bond issues were approved by the electors of the respective counties and the site thus established by said election; that on August 11, 1952, a three-way contract was entered into by the counties, the state highway commission and an engineering firm for the payment of engineering fees; that thereafter at the request of the board of Wabaunsee county the engineering firm selected a site at a point approximately one-fifth of a mile east of Belvue, known as the West site; that on April 24, 1953, the board of Wabaunsee county declared itself to be unanimously in favor of the East site; that on May 11, 1953, the board of Pottawatomie county voted two to one in favor of the West site; that on August 3, 1953, the board of Wabaunsee rescinded their action of April 24, 1953, and voted that the bridge be built at a third site approximately 1½ miles east of Belvue, about 800 feet east of the West site and this site was known as the Middle site; that all the proceedings occurred after the bond election, wherein the electors by their affirmative vote selected the original site about 2½ miles east of Belvue; that on August 14, 1953, at a joint meeting of the two boards a resolution was passed by a vote of 5 to 1 to proceed with the construction plans for a bridge at the Middle site at a point about a mile and one-fifth west of the East site; that the actions of the two boards selecting the Middle site constituted an illegal exercise of a discretionary power no longer possessed by defendants; that the East site was selected by the people at the election and any attempt to select any other site was a refutation of such action and illegal, and defendants were without discretionary power to change the location to any other site; that the bonds had been sold and in order to avert unnecessary delay and risk the loss of federal funds, the original jurisdiction of the court has been invoked.

The prayer was the boards be ousted from exercising the illegal powers described and that this court declare the law applicable and direct the defendants to proceed with the construction of the bridge upon the site selected by the people at a point approximately 2½ miles east of Belvue.

The boards filed similar answers in which they admitted many of the allegations of the petition and denied that the county engineers picked a site for the bridge, as alleged; that they picked a typical

location for a cost estimate, which would reflect the cost of any bridge built in that general vicinity; denied that the consulting engineers picked alternative sites but the three sites were submitted to the boards for final selection; denied that the electors by their affirmative vote selected the original site; denied that their action in selecting the Middle site constituted an unlawful and illegal act and alleged that unless plaintiff be denied the relief sought the construction of the bridge would suffer irreparable harm and possible loss of the bridge.

The prayer was that the writ be denied.

The stipulation of facts as far as we are concerned states that on August 24, 1950, at the preliminary meeting the two boards decided to have their county engineers select a favorable location and report; that it was originally contemplated that the consulting engineer pick a tentative, typical location, but his fee was considered too high and the boards instructed their county engineers to do it; it was also contemplated that the preliminary engineering on the typical location would give the respective county boards and the consultant sufficient information with which to proceed to pick a permanent site for the bridge. The contract between the two county boards and the engineering firm provided the counties agreed to select tentative sites; one of these is referred to as 2½ miles east of Belvue, thence south at right angles, 2 miles to the Kaw River; it was necessary to make a request of the engineer of secondary roads for a secondary road designation; this request referred to a location about 2½ miles east of Belvue; the request for federal aid referred to the same location; the letter from the engineer of secondary roads advising that federal funds had been approved only mentioned a location between Belvue and St. Marys; the resolution for each county to call an election referred to a point approximately 2½ miles east of Belvue; the notice of the special election referred to a point approximately 2½ miles east of Belvue; the ballot used that term, it is recited in each one of the bonds; the agreement between the two counties and the firm of consulting engineers for making of survey, preparation of plans, specifications and estimates referred to this location in technical language.

After all these steps the stipulation of facts states that on January 26, 1953, the consultant "flew" the Kaw from Topeka to between Belvue and St. Marys and picked two tentative sites, one was the site that has heretofore been referred to as the East site and the

other was a site described in the report, which will hereafter be known as the West proposed site; on April 24, 1953, the board of Wabaunsee county voted unanimously for the East site; on May 11, 1953, the Pottawatomie board voted for the West site two to one; on June 16, 1953, the two boards, the consultant representative of the Federal Bureau of Public Roads and of the state highway commission met at the proposed site, the consultant suggested a third tentative site known as the Middle proposed site; shortly afterwards each board received a letter. It follows:

"Yesterday afternoon, Mr. Frazier presented his estimates of the quantities for the approaches to the bridge on the above project to Mr. Tipton and Mr. Bolnick in our office. They showed that the west line would be the most economical with the one on the section line just east of it a fairly close second. The embankment quantities were about 100,000 and 145,000 cubic yards respectively. The east line would require about 300,000 cubic yards to provide a grade equal in utility to either of the first two. The east line would also require a bridge which would not be needed on either of the other lines. This would cost about $50,000.

"We discussed these estimates at some length and also the relative merits of the lines as regards traffic and suitability for bridge sites. After considering the factors mentioned above, we would like to recommend that the bridge be located on the east line of Sections 11 and 14, T. 10 S., R. 11 E. or within 300 or 400 feet upstream from it.

"Unless Mr. Frazier is notified differently, he contemplates starting his survey June 29. Please let him know immediately if you do not agree with our findings.

"Yours very truly,

WALTER JOHNSON

Engineer of Secondary Roads

By /s/ Geo. Epps

GEORGE EPPS

Bridge Engineer."

The location referred to in the above letter is approximately the so-called Middle location; on August 3, 1953, the Wabaunsee county board rescinded its earlier action and voted for the Middle location; on August 17, 1950, Pottawatomie voted for the Middle location; the Middle location is 1.51 miles from the east city limits of Belvue and south at right angles until such line intersects with the Kaw; it is also 2.31 miles in a southeasterly direction from a point where U. S. Highway 40 and 24 enters the east city limits of Belvue and south at a right angle until such line intersects with the Kaw.

The position of the state may be stated briefly. It is that the two boards of county commissioners prior to the election had right

to exercise a wide discretion in locating the bridge for submission to a vote. Counsel states they exercised that discretion when they did submit it, but that once having submitted their choice of locations to the public, and having received a mandate from the public so to fix the location, no discretion rested in them to act in a manner contrary to that mandate.

We cannot give the notice of the election, the ballot and the language used quite that strict an interpretation. The language upon which the state relies itself is not that strict. Throughout the phrase "location 2½ miles east of Belvue" is preceded by the word "approximately." There is not the least intimation of fraud or bad faith on the part of any public official. The statute, pursuant to which the project is going forward, is G. S. 1949, 10-204. It simply provides that "Whenever any two counties . . . are separated by a stream of water" the counties may join in the construction of a bridge and may share the expense. G. S. 1949, 10-205, provides for an election and that three-fifths of the votes cast at the election are necessary; and then the commissioners shall advertise for bids. There is no provision for submitting the location of the bridge to a vote.

The matter is analogous to the one with which we were confronted in *Johnson County Comm'rs v. Robb,* 161 Kan. 683, 171 P. 2d 784. There an election was had on the question whether bonds would be issued to build a sewer system and a sewage disposal plant. The board of county commissioners adopted a resolution setting forth certain items of the proposed improvements. Item III was a treatment and disposal plant, plant site and equipment therefor to be located near Turkey Creek and Roe Boulevard in Wyandotte county. The election notice set out the boundaries of the district and listed the proposed improvements. Under item III was the proposed treatment works in the Turkey Creek Valley near Roe Boulevard, in Wyandotte county. The form of the ballot contained no reference to where the plant was to be located. The bonds carried and there was threatened litigation as to an acquiescence of a site in Wyandotte county. The board thereupon found a suitable site in Johnson county, approximately a quarter of a mile from the original Wyandotte county site, which could be acquired without litigation, although its cost would be greater, and directed the Johnson county site be acquired.

The auditor refused to register the bonds. One of his grounds

was that inasmuch as the notice of election to vote bonds set out the site of the sewage disposal plant as being in Wyandotte county, as well as the cost, and the board contemplated obtaining a different site in Johnson county at a greater cost, this constituted an illegal departure from the action authorized by the voters. In dealing with this argument we said:

"We think the voters were fully apprized of the entire improvement proposed, and that the decision of the board, subsequent to the election, to acquire a site other than the one originally chosen, but within the approximate location, and at a cost, with the other improvements, within the amount authorized by the voters, did not warrant the auditor's action in refusing to register the bonds."

The state attempts to distinguish the instant case from the above by pointing out that in the instant case the boards were not confronted with any situation of necessity as confronted the Johnson county commissioners. The statement is not quite correct. Mr. Johnson's letter to the two boards of county commissioners pointed out that substantial savings would result from abandoning the so-called East site and locating the bridge at the Middle location. At any rate, the opinion is definite authority that an election with a notice, such as we have here, does not deprive the governing bodies of the municipalities, such as the county boards in this case, from the right to exercise any due discretion whatever. The county boards in this case were charged with the duty of locating this bridge at the most feasible and economical point under all the surrounding facts and circumstances. The decision to locate it a mile farther up the river than the approximate location mentioned in the election was not such a departure as to warrant the exercise of a writ of quo warranto against the county boards to oust them from proceeding to build the bridge at the location finally agreed on. Such is a substantial compliance.

The judgment will be for the defendants.